Daniel J. Pochoda (Bar No. 021979)
James Duff Lyall (Bar No. 330045)**
Victoria Lopez (Bar No. 330042)
Joel Edman (Bar No. 031324)
ACLU FOUNDATION OF ARIZONA
3707 North 7th Street, Suite 235
Phoenix, AZ 85014
T: (602) 650-1854
F: (602) 650-1376
*dpochoda@acluaz.org*
*jlyall@acluaz.org*
*vlopez@acluaz.org*
*jedman@acluaz.org*

David Loy*
Mitra Ebadolahi*
ACLU FOUNDATION OF SAN DIEGO
AND IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 232-2121
F: (619) 232-0036
*davidloy@aclusandiego.org*
*mebadolahi@aclusandiego.org*

* *Pro hac vice motions forthcoming*
***Admitted pursuant to Ariz. Sup. Ct. R. 38(f)*

*Attorneys for Plaintiffs*

**(*Additional Counsel On Subsequent Pages*)**

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

LEESA JACOBSON; PETER RAGAN,

　　　　　*Plaintiffs*

v.

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY; UNITED STATES
CUSTOMS & BORDER PROTECTION; UNITED
STATES OFFICE OF BORDER PATROL; JEH
JOHNSON, Secretary, United States Department of
Homeland Security, in his official capacity; R. GIL
KERLIKOWSKE, Commissioner, United States
Customs & Border Protection, in his official
capacity; MICHAEL J. FISHER, Chief of the
United States Border Patrol, in his official capacity;
JEFFREY SELF, Commander, Arizona Joint Field
Command, in his official capacity; MANUEL
PADILLA, JR., Chief Patrol Agent-Tucson Sector,
in his official capacity; ROGER SAN-MARTIN,
Agent in Charge-Tucson Border Patrol Station, in
his official capacity; LLOYD EASTERLING,
Assistant Agent in Charge-Tucson Border Patrol
Station, in his official capacity; BORDER PATROL
AGENT J. JOYNER, in his official capacity;
BORDER PATROL AGENT ROSALINDA
HUEY, in her official capacity; BORDER

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO.:

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF FOR
VIOLATION OF
PLAINTIFFS' FIRST
AMENDMENT RIGHTS**

SF: 204613-4

PATROL AGENT N. BALLISTREA, in her
official capacity; BORDER PATROL AGENT S.
SPENCER, in his official capacity; BORDER
PATROL AGENT K. RIDEN, in her official
capacity

      *Defendants.*

)
)
)
)
)
)
)
)
)
)
)

Winslow Taub*
Tracy Ebanks*
Ethan Forrest*
Covington & Burling LLP
1 Front Street
San Francisco, CA 94111-5356
T:  (415) 591-6000
F:  (415) 591-6091
*wtaub@cov.com*
*tebanks@cov.com*
*eforrest@cov.com*

Christina E. Dashe*
Covington & Burling LLP
9191 Towne Centre Drive, 6th Floor
San Diego CA 92122
T:  (858) 678-1800
F:  (858) 678-1600
*cdashe@cov.com*

 * *Pro hac vice motions forthcoming*

1.     This action is brought to vindicate Plaintiffs' First Amendment right to engage in political speech in a public forum—specifically, to protest, observe, and record law enforcement activity in their community.

2.     In February 2014, Plaintiffs, along with other members of the Arivaca community organization People Helping People, initiated a "checkpoint monitoring campaign" to protest the U.S. Border Patrol checkpoint on Arivaca Road in Amado, Arizona, and to observe, photograph, and video record the actions of Border Patrol agents at the checkpoint from a public right-of-way adjacent to the checkpoint. The campaign is the culmination of local residents' growing concern about Border Patrol activities in their community, including harassment and civil rights violations by federal agents at the checkpoint.

3. In response to the Arivaca residents' campaign, Border Patrol agents unconstitutionally interfered with Plaintiffs' speech and retaliated against them by: barring Plaintiffs from the public right-of-way adjacent to the checkpoint; requiring them and others monitoring the checkpoint with them to remain at an unreasonably great distance from the checkpoint; obstructing Plaintiffs' view by parking vehicles directly in the way; leaving parked vehicles running next to the checkpoint monitors for hours at a time so that the monitors would suffer from noxious fumes emissions; and threatening Plaintiffs with arrest, while allowing individuals who supported Defendants the same access to the public right-of-way that Defendants denied to Plaintiffs and other PHP monitors.

4.     In continuing these actions, Defendants are violating Plaintiffs' First Amendment rights and chilling their present and future exercise of these rights. Judicial intervention is required to end the Defendants' ongoing interference with Plaintiffs' freedom of speech and retaliation against Plaintiffs for exercising their First Amendment rights, and to prevent the ongoing irreparable harms to Plaintiffs resulting from these First Amendment violations.

**JURISDICTION AND VENUE**

5.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

1

6.      The Court may grant declaratory and injunctive relief for the constitutional violations alleged here under 5 U.S.C. § 702, 28 U.S.C. §§ 2201(a) and 2202, and/or Federal Rules of Civil Procedure 57 and 65.

7.      The United States and/or its officers or employees acting in their official capacities have waived sovereign immunity against actions seeking relief other than money damages. 5 U.S.C. § 702.

8.      Venue is proper in the District of Arizona under 28 U.S.C. §§1391(b) and (e), because the events that give rise to this action occurred within this district, and because one or more plaintiffs reside in this district.

## PARTIES

9.      Plaintiff Leesa Jacobson is a resident of Arivaca, Arizona and a member of People Helping People ("PHP"). Ms. Jacobson has volunteered as a PHP checkpoint monitor on multiple occasions since the initiation of PHP's checkpoint monitoring campaign, and continues to volunteer in that capacity.

10.      Plaintiff Peter Ragan is a resident of Arivaca, Arizona and a member of PHP. Mr. Ragan has volunteered as a PHP checkpoint monitor on multiple occasions since the initiation of PHP's checkpoint monitoring campaign, and continues to volunteer in that capacity.

11.      Defendant Department of Homeland Security ("DHS") is a Cabinet-level department that is responsible for the coordination and unification of national security efforts. Defendant DHS has authority over policies, procedures, and practices relating to the operation of U.S. Border Patrol interior vehicle checkpoints.

12.      Defendant United States Customs & Border Protection ("CBP") is an agency within DHS. Defendant CBP has authority over policies, procedures, and practices relating to the operation of Border Patrol interior vehicle checkpoints.

13.      Defendant Office of Border Patrol ("Border Patrol") is a sub-agency within CBP. Border Patrol is a federal law enforcement agency responsible for the enforcement of the laws and regulations governing the admission of foreign-born persons to the United

States. Border Patrol has responsibility for and oversight over policies, procedures, and practices relating to the operation of Border Patrol interior vehicle checkpoints.

14. Defendant Jeh Johnson is the Secretary of Homeland Security, vested with all functions of all officers, employees, and organizational units of DHS. Defendant Johnson has authority over all DHS policies, procedures, and practices relating to Border Patrol interior checkpoint operations. Defendant Johnson is sued in his official capacity.

15. Defendant R. Gil Kerlikowske is Commissioner of CBP. In that capacity, Defendant Kerlikowske has authority over all CBP policies, procedures, and practices relating to Border Patrol interior checkpoint operations. Defendant Kerlikowske is sued in his official capacity.

16. Defendant Michael J. Fisher is Chief of the Border Patrol. In that capacity, Defendant Fisher has direct responsibility for and oversight over Border Patrol policies, procedures, and practices relating to Border Patrol interior checkpoint operations. Defendant Fisher is sued in his official capacity.

17. Defendant Jeffrey Self is Commander of the Arizona Joint Field Command. In that capacity, Defendant Self has direct responsibility for and oversight over Tucson Sector Border Patrol policies, procedures, and practices relating to Border Patrol interior checkpoint operations in Tucson Sector. Defendant Self is sued in his official capacity

18. Defendant Manuel Padilla, Jr. is the Chief Patrol Agent for the Tucson Sector of the Border Patrol. In that capacity, Defendant Padilla has direct responsibility for and oversight over Tucson Sector Border Patrol policies, procedures, and practices relating to Border Patrol interior checkpoint operations in Tucson Sector. Defendant Padilla is sued in his official capacity.

19. Defendant Roger San-Martin is Agent in Charge of Tucson Border Patrol Station. In that capacity, Defendant San-Martin has direct responsibility for and oversight over Border Patrol policies, procedures, and practices relating to Border Patrol interior checkpoint operations in Tucson Sector. Defendant San-Martin is sued in his official capacity.

20.     Defendant Lloyd Easterling is Assistant Agent in Charge of Tucson Border Patrol Station. In that capacity, Defendant Easterling has direct responsibility for and oversight over Border Patrol policies, procedures, and practices relating to Border Patrol interior checkpoint operations in Tucson Sector. Defendant Easterling is sued in his official capacity.

21.     Defendant Border Patrol Agent J. Joyner is a Border Patrol Agent stationed in Tucson Sector. Defendant Joyner is sued in his official capacity.

22.     Defendant Border Patrol Agent Rosalinda Huey is a Border Patrol Agent stationed in Tucson Sector. Defendant Huey is sued in her official capacity.

23.     Defendant Border Patrol Agent N. Ballistrea is a Border Patrol Agent stationed in Tucson Sector. Defendant Ballistrea is sued in her official capacity.

24.     Defendant Border Patrol Agent S. Spencer is a Border Patrol Agent stationed in Tucson Sector. Defendant Spencer is sued in his official capacity.

25.     Defendant Border Patrol Agent K. Riden is a Border Patrol Agent stationed in Tucson Sector. Defendant Riden is sued in her official capacity.

### FACTS

26.     Border Patrol operates an interior checkpoint on Arivaca Road in Amado, Arizona ("Arivaca Road checkpoint").

27.     Arivaca Road is a paved two-lane county road that runs from Arivaca, Arizona, a town of 700 people, approximately twenty miles east to Amado, Arizona, a town of 300 people.

28.     The Arivaca Road checkpoint is located in a rural area surrounded by farmland and private residences, approximately one mile west of Amado and twenty-five miles north of the U.S.-Mexico border. The roadside of Arivaca Road is unpaved and designated as a public right-of-way.

29.     The Arivaca Road checkpoint consists of a small temporary shelter on the south side of the road, from which agents conduct checkpoint inspections, as well as an approximately 100-foot-long "secondary inspection" area, also on the south side of the

4

road, running east from and immediately adjacent to the shelter. Beginning several thousand feet to the east and west of the checkpoint, a series of road signs direct motorists to slow to a stop at the checkpoint, where they are questioned by the Border Patrol agent or agents on duty. Motorists may be directed to the secondary inspection area for further questioning.

30.     Arivaca Road is located in a rural area where traffic is minimal. Generally, no more than one or two vehicles arrive at the Arivaca Road checkpoint at any given time, and of all vehicles arriving at the checkpoint, only a small fraction are referred for secondary inspections.

31.     Despite being designated a temporary or "tactical" checkpoint, the Arivaca Road checkpoint has been in operation for approximately seven years, and is one of four interior Border Patrol checkpoints located within thirty miles of Arivaca. Arivaca residents must drive through a checkpoint in order to leave the area by automobile in any east, west, or northbound direction. Many residents must pass through the Arivaca Road checkpoint regularly, to go to school, to go to work, and to perform routine errands.

**People Helping People Campaign Protesting the Arivaca Road Checkpoint**

32.     In or around July 2013, the community organization People Helping People ("PHP") launched a campaign to protest the Arivaca Road checkpoint.

33.     PHP is an all-volunteer organization, founded by residents of Arivaca, Arizona to provide humanitarian aid along the U.S.-Mexico border. The organization sponsors an Abuse Documentation Clinic; co-sponsors the Arivaca Humanitarian Aid Office, in Arivaca, Arizona; and hosts public events such as community forums and educational workshops, including "Know Your Rights" and medical trainings, and presentations on border-related topics.

34.     Beginning in or around October 2013, PHP drafted and circulated a petition calling on Border Patrol to remove the Arivaca Road checkpoint, citing civil rights violations by agents at the checkpoint, along with harm to property values, tourism, and quality of life resulting from checkpoint operations. The petition also stated residents'

5

objection to the checkpoint for its role in contributing to migrant deaths and the militarization of the border region. More than 230 Arivaca residents and ten local business owners have signed the petition calling for the removal of the Arivaca Road checkpoint.

35.     PHP's petition drive followed the launch, in September 2013, of PHP's "Abuse Documentation Clinic," through which PHP invited local residents to document their experiences with Border Patrol in the community. PHP subsequently published a selection of residents' accounts to its website (http://phparivaca.org/). Several of those accounts described abuses by Border Patrol agents at the checkpoint, including prolonged interrogation and detention, invasive searches, false canine alerts, racial profiling, verbal harassment, and physical assault.

36.     On December 8, 2013, members of PHP and a group of more than 100 supporters delivered a copy of the petition to Border Patrol at the Arivaca Road checkpoint. There, PHP and its supporters staged a rally, with local residents carrying banners and signs and speaking out in opposition to the checkpoint.

37.     On January 15, 2014, the ACLU submitted an administrative complaint to DHS as well as Defendants Johnson and Padilla, on behalf of fifteen individuals alleging rights abuses at Border Patrol checkpoints in southern Arizona, almost half of which involved local residents at the Arivaca Road checkpoint.[1] To date, Defendants have not provided any information regarding whether any of those complaints have been investigated or resolved. Neither have Defendants responded to the alleged abuses of Arivaca residents documented on PHP's website, which are also incorporated into the ACLU's January 15 complaint.

38.     On or around January 16, 2014, Defendant Padilla sent a letter to PHP, stating that Border Patrol would not remove the checkpoint. Defendant Padilla noted,

---

[1] *See* ACLU OF ARIZ., COMPLAINT AND REQUEST FOR INVESTIGATION OF ABUSES AT U.S. BORDER PATROL INTERIOR CHECKPOINTS IN SOUTHERN ARIZONA, INCLUDING UNLAWFUL SEARCH AND SEIZURE, EXCESSIVE FORCE, AND RACIAL PROFILING (Jan. 15, 2014), attached as Exhibit A.

"You are welcome to bring to our attention specific incidents or issues regarding local residents at the checkpoint."

39.     On or around January 23, 2014, Congressman Raul Grijalva sent a letter to Border Patrol in support of the Arivaca residents' petition.

**Monitoring the Arivaca Road Checkpoint and Border Patrol Response**

40.     On January 22, 2014, PHP and its supporters staged a rally and press conference outside of Border Patrol's Tucson Sector headquarters to announce the start of a "community based effort" to monitor the Arivaca Road checkpoint and called for public hearings on the negative impacts of Border Patrol checkpoints.

41.     Before initiating these monitoring activities, Plaintiffs and other members of PHP drafted protocol and data collection materials for observing agents' interactions with motorists at the Arivaca Road checkpoint and for recording those observations. These materials included a "Checkpoint Vehicle Stop Report" and a "Checkpoint Monitoring Shift Report," which direct monitors to record checkpoint-related information based on their observations, including the names and agent numbers of any agents or other law enforcement present at the checkpoint; the duration of any checkpoint interrogations; the number of motorists searched, required to show identification, or referred for secondary inspection; the number of apprehensions and seizures; the incidence of canine searches and alerts; descriptions of every vehicle stopped at the checkpoint; the gender, apparent ethnicity, and approximate age of each vehicle's occupant(s); and other observations.

42.     PHP members initiated checkpoint monitoring activities on February 26, 2014 when, at approximately 11:00 a.m., a group of six designated PHP checkpoint monitors, including Plaintiff Ragan, arrived in the vicinity of the Arivaca Road checkpoint.

43.     The monitors wore fluorescent yellow traffic vests marked "Checkpoint Monitor" and carried a sign reading "Monitoring to Deter Abuse + Collect Data." Monitors were supplied with video cameras, notepads, and PHP materials, including the "Checkpoint Vehicle Stop Report" and a "Checkpoint Monitoring Shift Report." Using

7

these materials, Plaintiff Ragan and the other PHP monitors sought to observe all interactions between agents and motorists during the period monitoring occurred, and to record relevant information based on those observations.

44.    The monitors were accompanied by roughly two dozen additional protesters and PHP members, including Plaintiff Jacobson, several of whom carried signs and banners protesting the checkpoint with slogans such as, "Checkpoints Can't Divide Us!," "Arivaca Is Not At War! Demilitarize Now!," "Revitalize Not Militarize Border Communities," and "We R Watching."

45.    The group approached the checkpoint area from the east, walking on the public right-of-way on the south shoulder of the county road and remaining out of the path of traffic.

46.    When Plaintiff Ragan and the other PHP monitors were approximately 100 feet east of the checkpoint at the eastern terminus of the secondary inspection area, they were approached by Defendants Joyner and Riden. Defendant Joyner informed the monitors that they would have to "move back" past a cattle guard in the roadway, which was approximately 100 feet behind them and roughly 200 feet east of the checkpoint. Defendant Joyner also stated that the Border Patrol had a permit demarcating the boundaries of the checkpoint and promised to retrieve it.

47.    Plaintiff Ragan and the other PHP monitors remained in place and began to monitor and record interactions between agents and passing motorists, using a video camera and taking notes.

48.    Approximately twenty minutes later, Defendants Joyner and Riden returned. They told Plaintiff Ragan and the other PHP monitors that Border Patrol had a permit on site; Border Patrol would not provide a copy of the permit to the monitors; and that the monitors could instead "look it up."[2] Defendants Joyner and Riden repeated that Plaintiff

---

[2] Plaintiffs are aware of one "Permit to Use County Right of Way" obtained by the U.S. Border Patrol for the Arivaca Road checkpoint on February 26, 2004. That permit, a copy of which is attached as Exhibit B, however, does not demarcate the boundaries of the checkpoint, nor does it limit public access to the public-right-of-way. Upon information

8

1  Ragan and the other monitors needed to move and directed them to "back up to the cattle
2  guard" and out of the Border Patrol's "enforcement area." Defendants Joyner and Riden
3  then returned to the checkpoint.

4          49.     A short time later, Pima County Sheriff's Deputies arrived on the scene.
5  After conferring with Border Patrol for approximately fifteen minutes, Deputy Judd,
6  accompanied by Agents Joyner and Spencer, approached Plaintiff Ragan and the other
7  monitors. Deputy Judd asked Plaintiff Ragan and the other monitors to cross the street to
8  the north side of Arivaca Road. Deputy Judd pointed to an area directly across from where
9  the monitors were stationed, at the end of a line of Border Patrol vehicles. Plaintiff Ragan
10 and the other monitors agreed to go to the area indicated by Deputy Judd.

11         50.     In that area, however, the monitors' line of vision to the checkpoint
12 and the activities they sought to observe and record were obstructed by several Border
13 Patrol vehicles that were parked along the north side of the road. When some of the
14 monitors attempted to move closer to better observe the checkpoint, they were turned back
15 by agents, including Defendants Spencer, Ballistrea, Joyner, and Riden. Defendants
16 claimed the monitors were intruding on Border Patrol's "enforcement area." Those
17 monitors retreated to the area indicated by Deputy Judd, where Plaintiff Ragan had
18 remained.

19         51.     At approximately 1:30 p.m., Defendant Easterling approached and asked
20 Plaintiff Ragan and the other monitors to "move back" again, this time to an area
21 approximately fifty feet from where they were stationed and 150 feet east of the
22 checkpoint. Defendant Easterling said that he had seen a permit granting Border Patrol an
23

24 and belief, U.S. Border Patrol has no other permits related to its Arivaca Road checkpoint.
25 Additionally, Pima County Code of Ordinances Title X, Chapter 10.50.050,
   "Nonexclusive Use," which governs public right-of-ways, provides, "Nothing in this
26 chapter shall be construed to grant any user an exclusive right to use the public right-of-
27 way. Any user's facilities shall be erected, adjusted, installed, replaced, removed,
   relocated and maintained in a manner that will not interfere with the reasonable use of the
28 public right-of-way, drainage ways, alleys, or easements by the public, by county, or by
   any other user, or the rights and conveniences of adjacent property owners."

"enforcement zone" that extended 800 feet to the west of the checkpoint. Defendant Easterling said that he did not remember how far to the east the enforcement zone extended, but said that he was demarcating it as running to "the end of the pylons" and that the monitors had to move beyond that limit.

52.     Plaintiff Ragan and the other monitors communicated to Defendant Easterling that Pima County Sheriff's Deputies had directed them to stand in their present location. Defendant Easterling then summoned a different Pima County Sheriff, Sergeant Lapelini. Sergeant Lapelini did not say that the monitors were required to move. The monitors remained in place.

53.     Defendant Spencer and a second Border Patrol agent then proceeded to string yellow tape marked "U.S. Border Patrol Incident Scene" across the north and south shoulders of the road, approximately 150 feet east of the checkpoint. On both sides of the road, Border Patrol agents strung the tape from a private fence adjacent to the public right-of-way to a traffic barrier by the roadside, blocking off pedestrian access to the public right-of-way on both the north and south sides of Arivaca Road.

54.     Shortly after the Sheriff's Deputies left the scene, Defendant Easterling approached Plaintiff Ragan and the other monitors. Agent Easterling stated that if the monitors did not move, the agents would move them forcibly. Agent Easterling stated that this was "an order," and that if monitors resisted, they would be arrested.

55.     Under threat of arrest, Plaintiff Ragan and the other monitors relocated by moving east to an area behind the newly-installed boundary. From that distance, Plaintiff Ragan and the other monitors were unable to observe and record much of the checkpoint-related information they sought, including information regarding agents' identities, vehicle and motorist descriptions, and the nature and description of agents' interactions with motorists at the checkpoint.

**Additional Border Patrol Restrictions on Public Access to the Public Right-of-Way**

56.     At some point prior to March 1, 2014, Border Patrol modified the barriers on both sides of Arivaca Road, replacing the yellow incident tape with rope cordons

10

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

running from the private fence adjacent to the public right-of-way to a traffic barrier in the middle of the public right-of-way, and from there to another traffic barrier by the roadside.

57.    On each side of the road, Border Patrol also posted a sign: "Border Patrol Enforcement Zone — No Pedestrians Beyond This Point."

58.    Pedestrians passing by the checkpoint from either direction on the north or south right-of-ways could not pass without stepping under the rope cordons or into the roadway. The barriers have since been modified but remain in place and prevent observers from coming within about 150 feet of the checkpoint.

59.    On March 1, 2014, at approximately 10:30 a.m., a group of six PHP monitors returned to the north side of the Arivaca Road checkpoint. The monitors again carried video cameras, notepads, and PHP materials, including the "Checkpoint Vehicle Stop Report" and a "Checkpoint Monitoring Shift Report" in order to observe agents' interactions with motorists and record relevant information.

60.    The monitors stopped approximately 100 feet from the checkpoint, in roughly the same location they had agreed to use at the request of Deputy Judd on February 26.

61.    The monitors were approached by Defendant Huey and several unidentified agents. Defendant Huey informed the monitors that they were within Border Patrol's "zone of operation" and needed to stand behind the boundary. The monitors responded that they had returned to the same location to which they had been directed by Pima County Sheriff's Deputies on February 26. Defendant Huey stated that if the monitors did not move, Border Patrol would call the Pima County Sheriff's Office. The monitors objected and remained in place.

62.    After approximately one hour, Defendant Huey returned, again accompanied by several unidentified agents. Defendant Huey then stated, "There is nothing to discuss, there is nothing to decide. Either you move or we will arrest you." Another agent stated to Defendant Huey, "Just arrest them." Defendant Huey and another

agent produced handcuffs and began advancing on the monitors. Under threat of arrest, the monitors moved.

63.     One of the monitors asked the agents for their names. In response, Defendant Huey stated, "You have to move or we will place you under arrest. If you want our names you will have to move behind the barrier." Agents followed the monitors to the barrier, approximately 150 feet from the checkpoint. The agents then walked away without allowing the monitors to obtain the agents' names or agent numbers.

64.     An unidentified Border Patrol agent parked a vehicle directly in front of the monitors, on the west side of the barrier, blocking their line of vision. Another vehicle was parked in the same location on the south side of the road, just west of the barrier. At that time, there was ample space inside the "enforcement zone" for the Border Patrol vehicles to park without obstructing the monitors' view, including most of the north side of Arivaca Road adjacent to the checkpoint.

65.     Despite the existence of ample alternative parking locations, Border Patrol parked its vehicles immediately adjacent to the barriers and knowingly impeded the monitors' line of sight to the checkpoint.

66.     As before, agents denied monitors access to the vacant, unused space in the public right-of-way within 150 feet of the checkpoint. As a result, monitors were again unable to observe and record much of the checkpoint-related information they sought.

**Border Patrol Interference With, and Retaliation Against, Plaintiffs and Other Checkpoint Monitors**

67.     Members of PHP, including Plaintiffs Jacobson and Ragan, have continued to attempt to protest and observe Arivaca Road checkpoint operations to the best of their ability from behind Defendant Border Patrol's barriers. PHP monitors, including Plaintiffs, seek to observe interactions between agents and motorists, and to record relevant information based on those observations. These activities, however, continue to be greatly restricted by the barriers and the conduct of agents.

68.    For example, because they are restricted to observing from approximately 150 feet away, Plaintiffs and other PHP monitors have been unable to observe or record the identity of agents operating the checkpoint, and have had difficulty observing and recording descriptions of vehicles and vehicle occupants. Plaintiffs also have been unable to discern the nature of agents' interactions with motorists, whether conversational or inquisitional in nature, from behind the barriers. Plaintiffs are further impeded in their ability to observe and record the full range of actions taken by agents and by Border Patrol service canines, including canine "alerts" and agent inspections. As a result of the obstacles imposed by Border Patrol, Plaintiff and other PHP monitors' ability to gather basic information about public law enforcement practices has been severely limited.

69.    Additionally, as-yet unidentified Border Patrol agents have harassed, intimidated, and retaliated against the PHP monitors, including Plaintiffs, in direct response to their checkpoint monitoring campaign. Plaintiffs have themselves been subject to harassment, intimidation, and retaliation by agents at the checkpoint, and are aware of all incidents alleged herein in which other members of PHP were treated similarly.

70.    On multiple occasions following the initiation of the checkpoint monitoring campaign, Border Patrol agents parked vehicles next to the barriers for the purpose of obstructing the monitors' view, despite the ample availability of alternative parking locations. When Plaintiffs and other PHP monitors arrived at the checkpoint in the morning, Border Patrol agents moved their vehicles and parked them next to the barriers; after the monitors left, agents removed the vehicles.

71.    On more than one occasion, agents have parked a Border Patrol vehicle next to the barrier and left the engine running, with exhaust fumes directed at the monitors. In one instance, in an attempt to avoid the exhaust fumes blowing in their direction, the monitors moved to the opposite side of the road. The agent responded by parking a vehicle next to the barrier on that side of the road, again leaving the engine running. Both vehicles were left idling for approximately three hours while the monitors were present.

13

On another occasion, Plaintiff Jacobson was forced to breathe exhaust fumes directed at the monitors from a Border Patrol vehicle that was left running next to the barrier.

72.    On another occasion, the monitors could overhear agents shouting profanities that were directed at the monitors; one agent yelled to a passing motorist, "You should drive up and tell her, 'Bitch, don't film me!'"

73.    At no point since the onset of PHP's checkpoint monitoring activities have Plaintiffs or any other checkpoint monitors interfered or attempted to interfere with Border Patrol operations in any way.

74.    On March 7, 2014, Defendant San-Martin sent an e-mail to People Helping People, a copy of which is attached as Exhibit C, which read in part:

> The inside perimeter of the checkpoint is not a public place where anyone can just show up and establish ground. It is a "controlled area" for agents conducting their duties. By controlled I mean agents have the authority and are within their right to determine who can enter into the perimeter where they are conducting law enforcement actions. Agents have the right to perform their duties without impediment by individuals who are on scene. The decision on where monitors can stand/sit without interfering with agents and traffic is that of the agents and not the monitors.

75.    On March 11, 2014, Defendant San-Martin and Defendant Easterling spoke at the Arivaca Community Center. Members of PHP, including Plaintiff Ragan, were present.

76.    Defendants San-Martin and Easterling both asserted that Border Patrol had the authority to restrict access to the public area adjacent to the Arivaca Road checkpoint. Defendant Easterling stated that "the people who are going to dictate where they can and can't be are the agents on the scene." Defendant Easterling also noted that agents required the monitors to move "under threat of arrest." Defendant Easterling went on to say, "We're well aware that we have some agents out there that lose their minds. Well aware. And when we get the reports on that . . . we take care of it." Defendant Easterling stated that all agents should have their name tags visible.

14

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

77.     Defendant San-Martin acknowledged that Border Patrol vehicles had parked adjacent to the barriers to block ingress, but claimed there was no intention to obstruct the monitors' view of the checkpoint.

78.     Defendants Easterling and San-Martin also acknowledged that arrests at the Arivaca Road checkpoint are rare, but that the checkpoint serves as a "deterrent."

79.     Border Patrol agents at the Arivaca Road checkpoint have repeatedly allowed individuals not affiliated with PHP to access the area surrounding the checkpoint while denying that access to Plaintiffs and other PHP monitors. On April 3, 2014, PHP monitors, including Plaintiff Ragan, observed a local resident arrive and park his vehicle next to the barrier, directly inside the new "enforcement zone." That individual had previously directed obscene comments and gestures at the monitors, and on this occasion began to harass and video record the monitors stationed on the other side of the barrier.

80.     The man remained inside the barrier for approximately forty minutes, at one point parking his truck with one end protruding into the roadway. The man's wife also arrived and parked her car inside the barrier. As the man left the checkpoint area, he stopped in the westbound lane where monitors overheard him shout to the agents on duty, "Well, we had our fun today." The agents at the checkpoint smiled and laughed.

81.     Later, as Plaintiff Ragan was departing from the Arivaca Road checkpoint, he asked the agents at the checkpoint if they had given the man permission to remain inside the "enforcement zone." An agent replied, "It's a free country."

82.     On another occasion, monitors observed another man dressed in plain clothes go through the checkpoint, park his truck in the secondary inspection area, and approach the checkpoint on foot, where he conversed with agents for approximately twenty minutes.

83.     At some point subsequent to this encounter, Border Patrol replaced the "No Pedestrian" signs with new signs that read, "No Unauthorized Entry Beyond This Point." Those signs and the Border Patrol's barriers remain in place.  Photographs of the signs are attached as Exhibit D.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

84.    On April 17, 2014, the ACLU sent a letter to Defendants Padilla, Johnson, and Kerlikowske, a copy of which is attached as Exhibit E, demanding that Border Patrol cease harassing and discriminating against the checkpoint monitors, remove the barriers on Arivaca Road, and allow peaceful protest and monitoring activity from a short distance outside the primary inspection area.

85.    On April 24, 2014, Defendant Padilla sent a letter to the ACLU, a copy of which is attached as Exhibit F, asserting that Border Patrol would continue to restrict access to the public area adjacent to the Arivaca Road checkpoint.

86.    On July 3, 2014, the ACLU sent a second letter to Defendants Padilla, Johnson, and Kerlikowske, a copy of which is attached as Exhibit G, seeking a resolution of the dispute. To date, Defendants have not responded to that letter.

87.    On July 11, 2014, Plaintiff Ragan and other members of PHP participated in a checkpoint "Know Your Rights" rally at the Arivaca Road checkpoint. The rally took place on the west side of the checkpoint, while Plaintiff Jacobson and other PHP monitors set up to record checkpoint operations from the east. Members of the media were present and agents permitted reporters and pedestrians only to walk along the north side of the road from one end of the "enforcement zone" to the other. Agents again parked Border Patrol vehicles immediately adjacent to the barriers on both sides of the road, impeding Plaintiff Jacobson and other monitors' view of the checkpoint. As the monitors were departing, the Border Patrol vehicles were removed.

88.    Border Patrol agents at the Arivaca Road checkpoint and at other Border Patrol checkpoints repeatedly have asserted that motorists do not have the right to record checkpoint interactions. For example, the ACLU's January 15, 2014 administrative complaint describes an August 19, 2013 encounter in which a family of four was accosted by Defendant Riden for attempting to video record their checkpoint stop.[3]

---

[3] *See* ACLU COMPLAINT, *supra* n.1, at 8–9 ("When Mrs. Garcia exited the vehicle with the phone, Agent Riden yelled at her to turn it off, and tried unsuccessfully to grab the phone from Mrs. Garcia's hand, poking her chest. Mrs. Garcia handed the phone to her husband. Agent Riden continued to yell and demanded that Mr. Garcia turn the phone off.

16

89.   More recently, on August 1, 2014, a California resident filed a complaint with Pima County Sheriff's Department, alleging that a Border Patrol agent at the Arivaca Road checkpoint prevented her from videotaping a search of her vehicle.[4]

90.   On October 19, 2014, after analyzing monitoring data collected from February 26 to April 28, 2014, members of PHP presented initial findings of the checkpoint monitoring campaign at a community forum in Arivaca. Among other findings, PHP reported that Border Patrol agents at the Arivaca Road checkpoint were engaged in "systemic" discrimination, subjecting Latino motorists to far greater scrutiny and delay than Caucasian motorists. The monitors' report noted that the data was collected from an area "beyond monitors' ability to adequately see or hear Border Patrol operations" and that limitations imposed by Border Patrol "restricted [monitors'] ability to observe and record important information."

91.   After more than eight months and thousands of observed checkpoint stops, PHP monitors have not witnessed a single arrest at the Arivaca Road checkpoint.

92.   To the best of their ability, given the restrictions imposed upon them by Defendants, Plaintiffs and other PHP members have continued monitoring, recording, and collecting data concerning agents' interactions with motorists at the Arivaca Road checkpoint, and intend to continue analyzing the recorded data and reporting their findings. Their ability to do so remains significantly impeded by Defendants' actions, however, and PHP recently decided to narrow the scope of the data monitors will seek to

---

Agent Riden stated that Mr. Garcia could not use her phone to record because Border Patrol was searching the vehicle 'based on probable cause.' Agent Riden continued yelling at Mr. Garcia to turn off the phone . . . Mr. Garcia could see that Agent Riden's behavior was upsetting his children, so he turned the phone off, but not before Agent Riden attempted, again unsuccessfully, to grab the phone out of his hands.").

[4] *See Woman Claims Assault at Border Patrol Checkpoint*, GREEN VALLEY NEWS, Aug. 22, 2014, *available at* http://bit.ly/1rIWgRY ("A short video clip of the incident provided to the Green Valley News shows the agent grabbing the phone from the woman's hand. The woman also said the agent went through her phone and purse without permission.").

record. For example, monitors no longer attempt to record the identity of agents at the checkpoint because that information is impossible to discern from so far away.

**Border Patrol's Arbitrary "Enforcement Zone" and Harassment of Plaintiffs Violate the First Amendment**

93.     On information and belief, prior to February 26, 2014, Defendants never created or enforced a restricted checkpoint "enforcement area" or "zone," or any similar restriction on public access to the public right-of-way adjacent to the Arivaca Road checkpoint, or adjacent to any other Arizona interior vehicle checkpoint.

94.     On information and belief, prior to February 26, 2014, Defendants never erected "No Pedestrian" signs or other signage indicating restricted public access to the public right-of-way adjacent to the Arivaca Road checkpoint, or adjacent to any other Arizona interior vehicle checkpoint.

95.     On information and belief, subsequent to February 26, 2014, Defendants have not created or enforced any other checkpoint "enforcement zone" and have not installed "No Pedestrian" signage restricting access to the public right-of-way adjacent to any other interior vehicle checkpoint in Arizona other than the Arivaca Road checkpoint.

96.     On information and belief, prior to February 26, 2014, Defendants were aware that Plaintiffs and others working with them were critical of the practices of Border Patrol, including their criticism of arbitrary and unconstitutional actions by Border Patrol agents at the Arivaca Road checkpoint.

97.     On information and belief, Defendants established the "enforcement zone" and accompanying signage at the Arivaca Road checkpoint in direct response to the PHP monitoring campaign and to prevent protesters and monitors from accessing the public right-of-way adjacent to the checkpoint.

98.     On information and belief, Defendants DHS, CBP and Border Patrol have not promulgated regulations governing the boundaries of interior checkpoint "enforcement zones" or any similar exclusive zones of authority adjacent to interior vehicle checkpoints.

99.   On information and belief, Defendants DHS, CBP, Border Patrol, Johnson, Kerlikowske, Self, Fisher, Padilla, San-Martin, and Easterling have a policy and practice of delegating decisions regarding any restrictions on public access to public areas adjacent to Border Patrol interior checkpoints to the discretion of local sector chiefs, supervisors, and/or agents in the field. These delegations of authority do not include specific criteria or conditions for persons seeking to observe and/or record the activities of agents at Border Patrol interior checkpoints, nor instructions concerning the First Amendment rights of persons to engage in such observations.

100.   On information and belief, Defendants DHS, CBP, Border Patrol, Johnson, Kerlikowske, Self, Fisher, Padilla, San-Martin, and Easterling are aware of and condone the actions Border Patrol has taken to restrict public access to public areas adjacent to the Arivaca Road checkpoint, including the harassment, intimidation, and retaliatory acts Border Patrol agents have directed at Plaintiffs, and have taken no action to lift those restrictions or to prevent future harassment, intimidation, and retaliatory acts from being directed at Plaintiffs.

101.   By preventing and impeding Plaintiffs' checkpoint monitoring and protesting activities, and by threatening Plaintiffs with arrest, Defendants' actions have chilled, deterred, and infringed upon Plaintiffs' right to engage in protected speech, resulting in harm to Plaintiffs.

102.   Defendants' policies, customs, and/or practices concerning Plaintiffs' checkpoint monitoring and protesting activities have caused Border Patrol agents to chill, deter, and infringe upon Plaintiffs' right to engage in protected speech, resulting in harm to Plaintiffs and entitling them to declaratory and injunctive relief.

103.   Through harassment, intimidation, willful obstruction, and selective enforcement of the "enforcement area" at the Arivaca Road checkpoint, Defendants have discriminated and retaliated against Plaintiffs for exercising their First Amendment rights.

104.   The acts, omissions, policies, customs, and/or practices of all Defendants are causing irreparable harm to Plaintiffs due to interference with and chilling of their First

Amendment rights to protest and/or record checkpoints from a public right-of-way, for which they have no adequate remedy at law.

105.   An actual and immediate controversy has arisen and now exists between Plaintiffs and Defendants regarding Plaintiffs' ability to exercise First Amendment rights to protest, observe, and/or record the Arivaca Road checkpoint from a public right-of-way adjacent to the checkpoint. Plaintiffs are entitled to a declaration of rights with respect to this controversy. Without such a declaration, Plaintiffs will be uncertain of their rights and responsibilities under the law.

## CLAIMS

## COUNT ONE

### Unlawful Regulation of Plaintiffs' First Amendment Rights in a Public Forum
### (All Defendants)

106.   Plaintiffs reallege and incorporate by reference the allegations in all preceding paragraphs.

107.   The First Amendment to the United States Constitution prohibits infringement on and chilling of protected First Amendment activity.

108.   Defendants Easterling, San-Martin, Joyner, Huey, Ballistrea, Spencer, and Riden acted pursuant to Defendants DHS, CBP, Border Patrol, Johnson, Kerlikowske, Self, Fisher, and Padilla's expressly adopted official policy and/or longstanding practice of delegating authority regarding public access to public areas adjacent to interior vehicle checkpoints to the discretion of supervisors and/or agents in the field. This policy and/or practice affords an impermissible degree of discretion to agents and continues to be an impermissible prior restraint on speech and to chill, deter, and infringe upon Plaintiffs' First Amendment rights. Further, Defendants' definition of the "enforcement zone" and inconsistent regulation of Plaintiffs' proximity to Defendants' public activities in and near the checkpoints are both broader than needed to further Defendants' objectives.

20

109.     Defendants continue to infringe upon, restrict, and violate Plaintiffs' First Amendment rights because Plaintiffs' speech has been chilled by Defendants' policies, customs, and/or practices.

## COUNT TWO

**Retaliation Based on Rights Protected Under the First Amendment of the United States Constitution**

**(All Defendants)**

110.     Plaintiffs reallege and incorporate by reference the allegations in all preceding paragraphs.

111.     The First Amendment protects the rights of Plaintiffs to protest and to observe, take photographs, and make video recordings of public officials engaged in the public discharge of their duties.

112.     Defendants have violated Plaintiffs' First Amendment rights by improperly infringing upon and restricting Plaintiffs First Amendment rights and by harassing, intimidating, retaliating against and threatening Plaintiffs with arrest for engaging in constitutionally protected speech.

113.     Defendants continue to infringe upon, restrict, and violate Plaintiffs' First Amendment rights. Plaintiffs continue to face an imminent threat from Defendants of being harassed, intimidated, retaliated against or arrested if they engage in constitutionally protected activity.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that this Court:

A.     Issue a preliminary and permanent injunction restraining Defendants, their employees, agents, and successors from

    1.     Preventing, restricting, impeding, or otherwise interfering with Plaintiffs' First Amendment rights to protest and record the Border Patrol checkpoint on Arivaca Road, or any other Border Patrol

21

checkpoint situated similarly to the one on Arivaca Road, from the public right-of-way; and

2.    Preventing, restricting, impeding, or otherwise interfering with Plaintiffs' First Amendment rights to protest and record the Border Patrol checkpoint on Arivaca Road, or any other Border Patrol checkpoint situated similarly to the one on Arivaca Road, from areas where other members of the public are allowed to congregate.

B.    Enter a judgment declaring that

1.    Defendants have violated Plaintiffs' rights under the First Amendment; and

2.    Plaintiffs are entitled under the First Amendment to protest and record Border Patrol interior vehicle checkpoint operations from a reasonable distance outside the primary inspection area.

C.    Award Plaintiffs costs, including reasonable attorneys' fees, and

D.    Grant such other and further relief as the Court deems just and proper.

DATED this 20th day of November, 2014.

ACLU FOUNDATION OF ARIZONA
By /s/ James Lyall
Daniel J.  Pochoda
James Lyall
Victoria Lopez
Joel Edman
3707 North 7th Street, Suite 235
Phoenix, AZ 85014

ACLU FOUNDATION OF SAN DIEGO &
IMPERIAL COUNTIES
/s/ Mitra Ebadolahi
David Loy
Mitra Ebadolahi
P.O. Box 87131
San Diego, CA 92138-7131

22

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COVINGTON & BURLING, LLP
/s/ Winslow Taub
Winslow Taub
Tracy Ebanks
Ethan Forrest
1 Front Street, 35th Floor
San Francisco, CA 94612

COVINGTON & BURLING, LLP
Christina E. Dashe
9191 Towne Centre Drive, 6th Floor
San Diego, CA 92122

*Attorneys for Plaintiffs*