Daniel J. Pochoda (Bar No. 021979)
James Duff Lyall (Bar No. 330045)**
Victoria Lopez (Bar No. 330042)
Joel Edman (Bar No. 031324)
ACLU FOUNDATION OF ARIZONA
3707 North 7th Street, Suite 235
Phoenix, AZ 85014
T: (602) 650-1854
*dpochoda@acluaz.org*
*jlyall@acluaz.org*
*vlopez@acluaz.org*
*jedman@acluaz.org*

David Loy*
Mitra Ebadolahi*
ACLU FOUNDATION OF SAN DIEGO
AND IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 232-2121
*davidloy@aclusandiego.org*
*mebadolahi@aclusandiego.org*

Winslow Taub*
Tracy Ebanks*
Ethan Forrest*
Covington & Burling LLP
1 Front Street
San Francisco, CA 94111-5356
T: (415) 591-6000
*wtaub@cov.com*
*tebanks@cov.com*
*eforrest@cov.com*

Christina E. Dashe*
Covington & Burling LLP
9191 Towne Centre Drive, 6th Floor
San Diego CA 92122
T: (858) 678-1800
*cdashe@cov.com*
* *Admitted pro hac vice*
***Admitted pursuant to Ariz. Sup. Ct. R. 38(f)*

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

LEESA JACOBSON, PETER RAGAN,

    *Plaintiffs*,

    v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY, UNITED STATES CUSTOMS & BORDER PROTECTION, UNITED STATES OFFICE OF BORDER PATROL, ET. AL.,

    *Defendants*.

**Case No.:** 4:14-cv-02485-BGM

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**

**(ORAL ARGUMENT REQUESTED)**

## TABLE OF CONTENTS

**MOTION** ................................................................................................................ 1

**MEMORANDUM OF POINTS AND AUTHORITIES** ................................... 1

**I.    INTRODUCTION** ......................................................................................... 1

**II.    STATEMENT OF FACTS** ........................................................................... 3

A.  Plaintiffs Have Attempted to Observe and Record Arivaca Road Checkpoint;
Border Patrol Agents Have Unlawfully Erected Barriers in Response .......................... 5

B.  Border Patrol Has Specifically Targeted Plaintiffs for Exclusion Because of Their
Monitoring Activities and Their Views on the Checkpoint ............................................ 9

C.  Border Patrol's Restrictions on Monitoring Have Prevented Adequate
Documentation of Border Patrol Agents' Public Activities, and Are Not Justified By
Defendants' Preferred Rationales ................................................................................ 11

**III.    ARGUMENT** ............................................................................................... 12

A.  Plaintiffs Will Likely Succeed on the Merits of their First Amendment Argument 13

1.    *Plaintiffs Have a First Amendment Right to Observe, Photograph, and Record
Border Patrol Agents Performing Their Official Duties in Public View* ................... 13

2.    *Defendants Have Unlawfully Restricted Plaintiffs' Constitutionally-Protected
Activities* ...................................................................................................................... 15

B.  Plaintiffs Have Suffered and Continue to Endure Irreparable Harm as a Result of
Defendants' Violations of their First Amendment Rights ............................................ 21

C.  The Balance of Equities and Public Interest Favor an Injunction to Prevent Further
Constitutional Violations ............................................................................................. 22

**IV.    CONCLUSION** ........................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*ACLU of Ill. v. Alvarez*,
  679 F.3d 583 (7th Cir. 2012) ................................................................. 14, 22

*ACLU of Nev.v. City of Las Vegas*,
  333 F.3d 1092 (9th Cir. 2003) ............................................................... 16, 19

*Adkins v. Limtiaco*,
  537 F. App'x 721 (9th Cir. 2013) ................................................................. 13

*Alliance for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) ..................................................................... 13

*Bay Area Peace Navy v. United States*,
  914 F.2d 1224 (9th Cir. 1990) .......................................................... 17, 20, 21

*Boos v. Barry*,
  485 U.S. 312 (1988 ) ................................................................................... 16

*City Council of L.A. v. Taxpayers for Vincent*,
  466 U.S. 789 (1984) .................................................................................... 21

*City of Houston, Tex. v. Hill*,
  482 U.S. 451 (1987) .................................................................................... 24

*Elrod v. Burns*,
  427 U.S. 347 (1976) .................................................................................... 21

*Fordyce v. City of Seattle*,
  55 F.3d 436 (9th Cir. 1995) .............................................................. 2, 13, 23

*Galassini v. Town of Fountain Hills, Ariz.*,
  No. CV-11-02097-PHX-JAT, 2011 WL 5244960
  (D. Ariz. Nov. 3, 2011) ............................................................................... 22

*Gericke v. Begin*,
  753 F.3d 1 (1st Cir. 2014) .............................................................. 14, 15, 18

*Glik v. Cunnife*,
  655 F.3d 78 (1st Cir. 2011) ........................................................................ 23

*Hussein v. County of St. Louis, Missouri et al.*,
  4:14-cv-01410-JAR (E.D. Mo. November 21, 2014) .................................... 14

*Klein v. City of San Clemente*,
   584 F.3d (9th Cir. 2009)....................................................................... 21, 22, 25

*League of Wilderness Defenders/Blue Mountains Biodiversity Project v.*
   *Connaughton*,
   752 F.3d 755 (9th Cir. 2014) ....................................................................... 22

*Legend Night Club v. Miller*,
   637 F.3d 291 (4th Cir. 2011) ....................................................................... 24

*McCullen v. Coakley*,
   134 S. Ct. 2518 (2014)................................................................................. 20

*Melendres v. Arpaio*,
   695 F.3d 990 (9th Cir. 2012) ............................................................. 21, 22, 25

*Perry Educ. Assoc. v. Perry Local Educators' Assoc.*,
   460 U.S. 37 (1983)....................................................................................... 16

*R.A.V. v. City of St. Paul*,
   505 U.S. 377 (1992)..................................................................................... 18

*Robinson v. Fetterman*,
   378 F. Supp. 2d 534 (E.D. Pa. 2005) .......................................................... 23

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
   515 U.S. 819 (1995)..................................................................................... 17

*Sammartano v. First Judicial District Court*,
   303 F.3d 959 (9th Cir. 2002) ....................................................................... 22

*Shondel v. McDermott*,
   755 F.2d 859 (7th Cir. 1985) ....................................................................... 23

*Smith v. City of Cumming*,
   212 F.3d 1332 (11th Cir. 2000) ................................................................... 14

*Thalheimer v. City of San Diego*,
   645 F.3d 1109 (9th Cir. 2011) ..................................................................... 21

*United States v. Grace*,
   461 U.S. 171 (1983)..................................................................................... 16

*United States v. Soyland*,
   *3* F.3d 1312 (9th Cir. 1993) ....................................................................... 23

*United States . v. Stevens*,
   130 S.Ct. 1577 (2010).................................................................................. 19

iii

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989) ........................................................................................... 19, 20

*Watchtower Bible and Tract Society of New York, Inc. v. Village of Stratton*,
    536 U.S. 150 (2002) ................................................................................................ 19

*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008) ............................................................................................... 12, 13

**OTHER AUTHORITIES**

Fed. R. Civ. P. 65 ........................................................................................................... 1

U.S. Const. amend. I ............................................................................................... passim

# EXPLANATION OF CITATION FORMS

- "Ragan Decl." refers to the Declaration of Plaintiff Peter Ragan, dated December 23, 2014.

- "McLain Decl." refers to the Declaration of Steve McLain, dated December 23, 2014.

- "Ebanks Decl." refers to the Declaration of Tracy Ebanks, counsel for Plaintiffs dated December 23, 2014.

**MOTION**

Pursuant to Federal Rule of Civil Procedure 65, Plaintiffs move for a preliminary injunction:

1.     Prohibiting Defendants from barring Plaintiffs from any portion of the public right-of-way more than twenty feet outside of the primary and secondary inspection areas of the Border Patrol checkpoint on Arivaca Road, including the public right-of-way on the side of the road opposite the checkpoint shelter, such prohibition remaining in effect in the event that the checkpoint is relocated nearby.

2.     Prohibiting Defendants from deliberately infringing or interfering with Plaintiffs' First Amendment rights to observe or record the operation of the Border Patrol checkpoint on Arivaca Road from the adjacent public right-of-way, including by deliberately parking cars between the observers and checkpoint operations and by running Border Patrol vehicles so that the exhaust reaches Plaintiffs, and by verbally harassing Plaintiffs and gratuitously threatening arrest, such prohibition remaining in effect in the event that the checkpoint is relocated nearby.

This motion is supported by the following Memorandum of Points and Authorities, and declarations and exhibits attached thereto; on all papers, pleadings, records and files in this case; on all matters of which judicial notice may be taken; and on such other argument and/or evidence as may be presented to this Court at a hearing on this motion.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.     INTRODUCTION**

Plaintiffs Peter Ragan and Leesa Jacobsen seek to exercise their First Amendment rights to observe, photograph, and record from a public area the actions of law

enforcement officials at an interior checkpoint on Arivaca Road in Amado, Arizona. Platintiffs' right to engage in these expressive activities is clearly established. *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995).

Defendants have imposed arbitrary restrictions on Plaintiffs' ability to observe and record checkpoint operations, restrictions that are untethered to any demonstrable law enforcement purpose. In direct response to Plaintiffs' activities, Defendants installed barriers in the public right-of-way which impede pedestrian traffic and confine Plaintiffs to an area nearly 200 feet from the Arivaca Road checkpoint. Defendants have parked Border Patrol vehicles immediately adjacent to those barriers to obscure Plaintiffs' view, and have left those vehicles running with their exhaust directed into the observation areas. Plaintiffs have been threatened with arrest each time they have attempted to observe from a shorter and more reasonable distance. Meanwhile, Defendants have allowed others— including members of the public more sympathetic to Defendants' checkpoint operations—access to the same area from which Plaintiffs are excluded.

A preliminary injunction is necessary to vindicate Plaintiffs' rights, and is warranted under the circumstances presented in this case. First, Plaintiffs are likely to succeed on the merits of their First Amendment claims, given the well-established constitutional right to view and photograph public activities of law enforcement personnel. The restrictions imposed by Defendants have also chilled Plaintiffs and persons working with them from exercising those rights by significantly reducing the usefulness of their observation, and by deterring Plaintiffs and other monitors from engaging in constitutionally protected activity. Second, Plaintiffs are irreparably harmed by Defendants' actions. The loss of Plaintiffs' First Amendment rights constitutes

irreparable harm as a matter of law; this loss is continuing and Plaintiffs have to choose on a daily basis whether to forego exercise of their fundamental rights or be threatened with arrest and retaliation.  Here, that harm is especially concrete, as Plaintiffs are unable to observe the activities of the checkpoint in any significant detail from their distant position.  Third, the lawful exercise of constitutional rights presumptively serves the public interest, and the equities favor the party exercising those rights.  Here, in addition, the monitoring that Plaintiffs seek to accomplish serves the public interest by holding Border Patrol agents accountable.

Absent a Preliminary Injunction, Plaintiffs and others will continue to suffer irreparable injury resulting from the ongoing loss of their First Amendment rights.

**II.   STATEMENT OF FACTS**

For more than seven years, residents of the towns of Arivaca and Amado in Arizona have lived with a continuous and pervasive Border Patrol presence in their community.  Border Patrol checkpoints are present on virtually every route out of Arivaca, and many local residents must pass through a checkpoint regularly to go to school or work, or to perform routine errands.  Ragan Decl. ¶ 5.  In the past year, residents have sought to monitor one of these checkpoints, on Arivaca Road in Amado ("Arivaca Road checkpoint"), to document and deter suspected abuses by Border Patrol agents and to measure the efficacy of the checkpoint and its impact on the local community.

The Arivaca Road checkpoint is located on a two-lane road in a rural area where traffic is minimal.  Ragan Decl. ¶ 7.  The checkpoint consists of a small "temporary" shelter on the south side of the road, from which agents conduct checkpoint inspections of

eastbound traffic, as well as a dirt area to the east of the checkpoint shelter on the south

side of the road, which is used for secondary inspections.  *See* Ragan Decl. ¶ 9.



(McLain Decl. Ex. 2 (*excerpt*))

The Arivaca Road checkpoint is located between Arivaca and Amado, rural towns with a

combined population of 1,000 and few local businesses.  Ragan Decl. ¶ 6.  As indicated

by data collected by Plaintiffs and other monitors, Arivaca Road is not heavily trafficked,

and checkpoint arrests are extremely rare.  In approximately 100 hours of monitoring from

February to March 2014, Plaintiffs and other monitors observed 2,379 vehicles pass

eastbound though the Arivaca Road checkpoint, an average of approximately one vehicle

every two and half minutes during the busiest times in the day.  *See* Ragan Decl. Ex. 1.

Over the same period, monitors did not observe a single driver or passenger detained by

agents at the checkpoint.  Ragan Decl. ¶ 7.  Indeed, Defendants have acknowledged that

arrests at the Arivaca Road checkpoint are extremely rare, and that the primary purpose of

the checkpoint is "deterrence." *Id*.

       After being questioned by the Border Patrol agent or agents on duty, eastbound

motorists may be directed to the secondary inspection area for further questioning.  Ragan

Decl. ¶ 9.  Only a small fraction of vehicles arriving at the checkpoint are referred for

secondary inspections.  *Id.*  Border Patrol's activities are largely confined to the south side of the road, east of the checkpoint shelter; the north side of the road, across from the checkpoint shelter, and the area west of the checkpoint shelter are not used for inspections.  *Id*.

In July 2013, the Arivaca, Arizona-based organization People Helping People ("PHP"), of which Plaintiffs are members, sponsored a forum for local residents to discuss the Border Patrol presence in their community.  Ragan Decl. ¶ 10.  At this forum, residents described harassment and abuse by Border Patrol agents at the Arivaca Road checkpoint, which, despite being designated a temporary or "tactical" checkpoint, has been in continuous operation for over seven years.  Ragan Decl. ¶¶ 5, 10.  Following the community forum, PHP began a campaign to protest the checkpoint and inform the public about its impact on the community.  Ragan Decl. ¶ 11.  PHP launched an "Abuse Documentation Clinic" and circulated a petition calling for removal of the checkpoint. Ragan Decl. ¶¶ 11, 12.  Complaints documented by PHP described Border Patrol agents engaging in civil rights violations at the checkpoint including racial profiling, false canine alerts, unlawful searches, and excessive use of force by agents.  Ragan Decl. ¶ 11.  In support of this campaign, and to hold agents at the checkpoint accountable, PHP announced that it would be starting a community effort to monitor the Arivaca Road checkpoint.  Ragan Decl. ¶ 12.

A.   **Plaintiffs Have Attempted to Observe and Record Arivaca Road Checkpoint;  Border Patrol Agents Have Unlawfully Erected Barriers in Response**

Since the intiation of PHP's monitoring campaign in February 2014, Border Patrol agents at the Arivaca Road checkpoint have routinely and deliberately interfered with

1   Plaintiffs' ability to observe and record checkpoint activities.  On February 26, 2014,  the

2   first day of monitoring, Plaintiffs, as part of a group of approximately thirty PHP

3   checkpoint monitors and protestors, approached the secondary inspection area from the

4   east, walking on the south side of Arivaca Road.  Ragan Decl. ¶ 13.  The monitors carried

5   signs that read "Monitoring to Deter Abuses + Collect Data."  The protestors carried signs

6   and banners protesting the checkpoint with slogans such as, "Checkpoints Can't Divide

7   Us!," and "Revitalize Not Militarize Border Communities."  *Id*.

8   

9       When Plaintiff Ragan and the other monitors were approximately 100 feet east of

10  the checkpoint shelter (*See* Ragan Decl. *Diagram A* "Position 1"), the group was

11  confronted by Defendants Joyner and Riden and told to move back past a cattle guard in

12  the road, approximately 160 feet from where they were standing, and approximately 260

13  feet away from the eastern end of the checkpoint shelter.  Ragan Decl. ¶ 15.



(Ragan Decl., *Diagram A*)

14      The monitors refused, remained in place, and began to observe and record

15  interactions between agents and motorists.  Ragan Decl. ¶ 15.  Defendants returned and

16  again insisted that Plaintiff Ragan and the other monitors move further away.  Ragan

17  Decl. ¶ 16.  Defendants Joyner and Riden stated that they had a permit granting exclusive

6

use of the area.[1]  *Id*.  Later, after also being directed by local Sheriff's Deputies, the monitors moved to an area on the north side of the road directly across from where they had been stationed, and approximately 100 feet east of the checkpoint shelter.  Ragan Decl. ¶ 17, *Diagram A* "Position 2."  Once relocated to the north side of the road, some of the monitors attempted to move closer to the checkpoint, but were turned back by several Border Patrol agents.  *Id*.  At all times, Plaintiffs were outside of the areas in which Border Patrol was conducting its inspections.

Later that day, to restrict the monitors' activities and reduce their ability to observe the checkpoint, Border Patrol agents erected barriers demarcating an arbitrarily determined "enforcement zone," approximately 80 feet further east of where the Plaintiffs and monitors were standing on the north shoulder, a total of approximately 180 feet east of the checkpoint shelter.  Ragan Decl. ¶ 19.  The barriers were erected across the public-right-of-way on both the north and south shoulders of the road, even though Border Patrol's checkpoint activities are limited to the south shoulder of the road.  *See* Ragan

---

[1] Plaintiffs later discovered that Border Patrol apparently obtained a "Permit to Use County Right of Way", Permit No. P04RW00558, for the Arivaca Road checkpoint on February 26, 2004.  The description of the "proposed work" for the permit is "to establish checkpoints on Arivaca Rd to help US Border Patrol."  That permit does not, however, demarcate the boundaries of the checkpoint or limit public access to the public right-of-way.  *See* Ebanks Decl. Ex. 1. Indeed, the permit provides that: "The applicant [here, Border Patrol] will not allow any condition to exist which would be a hazard or a source of danger to the traveling public."  Further, Pima County Code of Ordinances Title X, Chapter 10.50.050, "Nonexclusive Use," which governs public right-of-ways, provides, "Nothing in this chapter shall be construed to grant any user an exclusive right to use the public right-of-way.  Any user's facilities shall be erected, adjusted, installed, replaced, removed, relocated and maintained in a manner that will not interfere with the reasonable use of the public right-of-way, drainage ways, alleys, or easements by the public, by country, or by any other user, or the rights and conveniences of adjacent property owners."

Decl. ¶¶ 9, 19.  Prior to the initiation of PHP's campaign, Defendants had never before demarcated an "enforcement zone" or installed similar barriers at the Arivaca Road checkpoint.  Ragan Decl. ¶ 21.  Border Patrol agents then insisted that Plaintiffs and the monitors move behind the barrier, and threatened them with arrest if they did not comply.  Ragan Decl. ¶ 19.  Under threat of arrest, Plaintiffs and others in their group  relocated to an area behind the barrier.  Ragan Decl. ¶ 19, *Diagram A* "Position 3".

Since that time, Border Patrol has maintained barriers[2] on the public-right-of-way, keeping Plaintiffs and the monitors at an unreasonable distance from the checkpoint.  Ragan Decl. ¶ 22.  As a result, Plaintiffs and others have not been able to observe and record basic checkpoint activities.  From behind the barriers, persons seeking to monitor the checkpoint activities are unable to observe agents' interactions with motorists, and are thus unable to record information about the checkpoint activity, including the identity of agents conducting the stops, the characteristics of the vehicle occupants, the behavior of any service canines, and the nature of communications between agents and motorists.  Ragan Decl. ¶ 20.  Because Defendants' restrictions frustrate the purpose of Plaintiffs' campaign and severely limit observation of Border Patrol's public activities, Plaintiffs and other monitors have curtailed monitoring activities and participation in the monitoring campaign has diminished.  *See* Ragan Decl. ¶¶ 31–34.

---

[2] Following the first day of monitoring, Border Patrol erected new rope barriers on both sides of the road, and posted a sign that read "Border Patrol Enforcement Zone - No Pedestrians Beyond this Point."  Border Patrol later replaced this sign with new signs that read, "No Unauthorized Entry Beyond This Point."  The barriers and signs have remained in the same location, 180 feet east of the checkpoint, since Border Patrol's initial encounter with the monitors.  Ragan Decl. ¶ 22.

Border Patrol agents have continued to threaten monitors with arrest whenever they attempt to stand closer to the checkpoint.  Ragan Decl. ¶ 25.  In March 2014, monitors again attempted to move to an area inside the barriers— an empty space across the road from the checkpoint shelter on the north shoulder and approximately 100 feet east of the shelter.  *See* Ragan Decl. ¶ 23.  Border Patrol agents again forced the monitors to relocate behind the Border Patrol barriers under threat of arrest.  *Id*.  As a result, monitors were again unable to observe and record much of the checkpoint-related information they sought.  Ragan Decl. ¶ 24.

**B.    Border Patrol Has Specifically Targeted Plaintiffs for Exclusion Because of Their Monitoring Activities and Their Views on the Checkpoint**

Defendants' actions since the erection of the barriers are inconsistent with the assertion that the roped-off area is needed for "enforcement," and evince a pattern of selective targeting of Plaintiffs.

For example, on April 3, 2014, PHP monitors, including Plaintiff Ragan, observed a local resident arrive and park his vehicle next to the barrier, directly inside Border Patrol's newly-designated "enforcement zone."  Ragan Decl. ¶ 27.  That resident began to heckle the monitors stationed on the other side of the barrier.  He remained inside the barrier for approximately forty minutes, at one point parking his truck with one end protruding into the roadway.  *Id*.  The man's wife also arrived and parked her car inside the barrier.  *Id*.  At no point did Border Patrol agents ask either of them to leave the "enforcement zone." *Id*.  As Plaintiff Ragan was departing, he asked the agents at the checkpoint if they had given the man permission to remain inside the "enforcement zone;" an agent replied, "It's a free country."  Ragan Decl. ¶ 28.

9

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

On November 23, 2014, Steve McLain, a professional surveyor, conducted a survey of the checkpoint.  McLain Decl. ¶ 8.  When he asked whether he could conduct the survey in the area surrounding the checkpoint, including within the "enforcement zone," the Border Patrol agents on duty informed him that the barriers were only in place to exclude protesters or others the Border Patrol agents believe to be disruptive to the checkpoint, and not the public in general.  McLain Decl. ¶ 15.

No "enforcement zone" was ever established prior to Plaintiffs' monitoring campaign, and no analogous area is known to exist at any other checkpoint in the area.  Ragan Decl. ¶ 21.  Rather, Border Patrol hastily installed the barriers on Arivaca Road specifically in response to Plaintiffs' efforts to observe and monitor public law enforcement activities at the checkpoint.

Defendants have acknowledged that the agents at the checkpoint are given discretion to choose which members of the public are allowed near the checkpoint.  In a March 7, 2014 email sent from Defendant San-Martin to PHP, he stated that "agents have the authority and are within their right to determine who can enter into the perimeter where they are conducting law enforcement actions….The decision on where monitors can stand/sit without interfering with agents and traffic is that of the agents and not the monitors."  *See* Ebanks Decl. Ex. 2 (emphasis added).  At a March 11, 2014 presentation at the Arivaca Community Center, Assistant Agent in Charge Easterling stated that "the people who are going to dictate where [the monitors] can and can't be are the agents on the scene," even though he noted that Border Patrol was "well aware that we have some agents out there that lose their minds. . . and when we get the reports on that . . . we take care of it."  Ragan Decl. ¶ 26.

10

Agents at the checkpoint have used this discretion to interfere with Plaintiffs' observations, for example, by parking vehicles in Plaintiffs' line of sight.  For example, at a July 2014 checkpoint rally, agents parked Border Patrol vehicles immediately adjacent to the barriers on both sides of the road, impeding Plaintiff Jacobson and other monitors' view of the checkpoint for over an hour.  Ragan Decl. ¶ 29.

On more than one occasion, agents have parked a Border Patrol vehicle next to the barrier and left the engine running, with exhaust fumes directed at the monitors.  In one instance, in an attempt to avoid the exhaust fumes blowing in their direction, the monitors moved to the opposite side of the road.  Ragan Decl. ¶ 30.  An agent responded by parking a vehicle next to the barrier on that side of the road, again leaving the engine running.  *Id*. Both vehicles were left idling for approximately three hours while the monitors were present.  *Id*.

**C.** **Border Patrol's Restrictions on Monitoring Have Prevented Adequate Documentation of Border Patrol Agents' Public Activities, and Are Not Justified By Defendants' Preferred Rationales**

Due to Border Patrol's restrictions, all observations have been made from a distance that has severely limited Plaintiffs' ability to monitor the Checkpoint.  As a result of the great distance from which monitors are forced to observe checkpoint interactions, monitors have been unable to collect accurate data on the identity of agents conducting the stops; descriptions of the vehicle occupants beyond what can be determined from distant observation; or the nature of agents' interactions with motorists—whether conversational or inquisitional in nature—including whether agents' conduct is abusive, or vehicle occupants express objections to an agent's line of questioning.  Plaintiffs have also been

11

unable to observe and record the full range of actions taken by agents and by Border Patrol service canines, including canine "alerts" and agent vehicle inspections.

But even the limited observations that monitors have made suggest that the restrictions on their ability to observe checkpoint activity may conceal inappropriate agent conduct. Specifically, PHP's intial findings, based on monitoring from March to February 2014, suggested that Latino motorists are subjected to discriminatory practices. Ragan Decl. Ex. 1. Based on its limited stop data, PHP concluded that Latinos are approximately twenty times more likely than Caucasians to be referred for secondary inspection, and twenty-six times more likely to be asked to show identification. *Id*. But as noted in their findings, Plaintiffs and PHP are severely limited in their ability to confirm, describe, or elaborate upon this apparent discrimination, or other checkpoint activity, from the distant vantage point to which they are confined. *Id.*

Actual or alleged civil rights violations aside, law enforcement activity at the Arivaca Road checkpoint is minimal. As noted above, the checkpoint is located in a rural area where vehicle traffic is very light. PHP has not observed a single arrest or seizure of contraband. Defendants themselves acknowledge that apprehensions at the checkpoint are rare. Ragan Decl. ¶ 7.

## III.   ARGUMENT

A preliminary injunction is warranted if Plaintiffs show their likelihood of success on the merits and their suffering of irreparable harm, and the balance of equities and public interest favor an injunction. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). The Ninth Circuit has adopted a "sliding scale" approach under which if a plaintiff can show that there are at least serious questions going to the merits,

then a preliminary injunction may issue if the balance of the hardships tips sharply in the plaintiff's favor, and the other two *Winter* factors are satisfied.  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011).

Plaintiffs are entitled to a preliminary injunction, because Border Patrol agents continue to infringe their First Amendment rights to observe and record government officials in the performance of their duties, causing irreparable harm as a matter of law and on the specific facts of this case.  The balance of equities and public interest always favor protecting freedom of speech, and the public interest also favors maintaining accountability in the operation of law enforcement operations at the Arivaca Road checkpoint.

## A.    Plaintiffs Will Likely Succeed on the Merits of their First Amendment Argument

Plaintiffs will likely succeed on the merits of their First Amendment claim that Border Patrol is unlawfully restricting their well-established First Amendment right to observe, photograph, and record Border Patrol agents performing their official duties in a public forum.

### 1.    Plaintiffs Have a First Amendment Right to Observe, Photograph, and Record Border Patrol Agents Performing Their Official Duties in Public View

The First Amendment protects the right to observe, photograph and video record law enforcement officers in public fora.  *Fordyce* , 55 F.3d at 439 (recognizing First Amendment right to film matters of public interest).  Courts have long recognized this right, which the Ninth Circuit has described as "clearly established."  *Adkins v. Limtiaco*, 537 F. App'x 721, 722 (9th Cir. 2013) (noting that the right to photograph law

13

enforcement activities is "clearly established."); *ACLU of Ill. v. Alvarez*, 679 F.3d 583,

595, 601 (7th Cir. 2012) (making audiovisual recording "is necessarily included within the

First Amendment's guarantee of speech and press rights"); *Smith v. City of Cumming*, 212

F.3d 1332, 1333 (11th Cir. 2000) (upholding First Amendment rights of third parties

filming traffic stops "to gather information about what public officials do on public

property, and specifically, a right to record matters of public interest").  More specfically,

the First Circuit has held it to be "clearly established" that a bystander has the right to

record an officer conducting a traffic stop from a distance of "at least thirty feet,"

provided that the filming itself does not interfere with the officer's duties.  *Gericke v.

Begin*, 753 F.3d 1, 3–8 (1st Cir. 2014).

Just last month, a district court judge in the Eastern District of Missouri issued

three court orders prohibiting law enforcement in St. Louis, Missouri and Ferguson,

Missouri from arresting, threatening to arrest, or interfering with individuals who are

photographing or recording violent demonstrations and police response in public places

but who are "not threatening the safety of others or physically interfering with the ability

of law enforcement to perform their duties." *Hussein v. County of St. Louis, Missouri et

al.*, 4:14-cv-01410-JAR (E.D. Mo. November 21, 2014) Ebanks Decl. Exs. 3-5.  The First

Amendment right to observe thus applies even in areas of intense conflict and substantial

police activity, where there is genuine risk of public harm, so long as the observers are not

themselves creating that risk.  By implication, it applies even more strongly here, where

there has been no observed violence or safety threats of any kind, and there is no

suggestion that the demonstrators are creating or amplifying risks to public safety.

14

Plaintiffs therefore have a First Amendment right to observe, record, and photograph the Border Patrol's checkpoint operations from a reasonable distance, provided they do not interfere with those operations.

### 2. Defendants Have Unlawfully Restricted Plaintiffs' Constitutionally-Protected Activities

Border Patrol agents at the Arivaca Road checkpoint have engaged in persistent efforts to interfere with Plaintiffs' well-established First Amendment rights to observe and record Border Patrol's activities.  Border Patrol agents continue to force Plaintiffs and monitors to remain at an unreasonable distance—approximately 180 feet—from the checkpoint shelter where inspections are conducted.  This distance is much greater than required to eliminate the possibility of interference, and much greater than the distances endorsed by federal courts in similar contexts.  *See, e.g.*, *Gericke*, 753 F.3d at 3–8 (finding "thirty feet" to be a reasonable distance from which to record an officer conducting a traffic stop).  Border Patrol agents have also taken deliberate steps, including threats of arrest, to prevent Plaintiffs from remaining near the checkpoint.  These actions have impeded Plaintiffs' ability to observe and record the Border Patrol agents' interactions with motorists.  As discussed below, Border Patrol has singled out Plaintiffs for this treatment based on Plaintiffs' viewpoint.  As a content based infringement of free speech, the actions of Defendants must meet the high standard of "strict scrutiny."  But even under a more deferential standard, there is no adequate justification for the restrictions; they are not "narrowly drawn" and prohibit more protected speech than required for any legitimate law enforcement purpose.

### a) Defendants' Restrictions Are Content-Based and Unconstitutionally Infringe on Plaintiffs' Rights

15

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The Border Patrol agents' restriction on Plaintiffs' and the other monitors' speech is content-based.  A content-based restriction on speech in a public forum is impermissible absent a showing that the restriction is (1) necessary (2) to serve a compelling governmental interest, and (3) narrowly tailored to achieve that end.  *Boos v. Barry*, 485 U.S. 312, 321–22 (1988 ) (citing *Perry Educ. Assoc. v. Perry Local Educators' Assoc.*, 460 U.S. 37, 45 (1983)).  As a threshold issue, public streets like Arivaca Road are public fora, places historically held open for the public's expressive activities.  *United States v. Grace*, 461 U.S. 171, 177–80 (1983); *ACLU of Nev.v. City of Las Vegas*, 333 F.3d  1092, 1099 (9th Cir. 2003).  Accordingly, the government's ability to restrict Plaintiffs' speech on and near Arivaca Road is "very limited."  *Grace*, 461 U.S. at 177.

On more than one occasion, the Border Patrol has excluded Plaintiffs from the enforcement area while allowing access by others.  Border Patrol agents allowed a member of the community known to be supportive of Border Patrol and hostile to PHP monitors to park in the so-called "enforcement zone" where he remained for nearly an hour, harassing PHP monitors.  A professional surveyor conducting a survey of the checkpoint was also allowed to enter the "enforcement zone," and was told by Border Patrol agents that the barriers were only in place to exclude protesters and the like, not the public in general.  McLain Decl. ¶ 15.

Border Patrol's selective exclusion of Plaintiffs is apparent for a wholly separate reason:  no similar "enforcement zone" existed at the Arivaca Road checkpoint prior to Plaintiffs' monitoring activities, nor at any other Border Patrol checkpoint in the surrounding area.  *See* Ragan Decl. ¶ 21.  The roped-off area at the Arivaca Road

16

checkpoint was created in direct response to PHP's campaign, and is maintained in order to deter Plaintiffs' legitimate monitoring activity.

Defendants' selective enforcement is not coincidental; Border Patrol is familiar with Plaintiffs' viewpoints as a result of the long history of interaction between Border Patrol and PHP. Border Patrol's decision to exclude PHP checkpoint monitors, including Plaintiffs, while not enforcing the same restrictions against supportive or neutral individuals, constitutes viewpoint discrimination, "an egregious form of content discrimination" prohibited by the First Amendment. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

Defendants can point to no compelling interest that justifies such expansive restrictions on Plaintiffs' monitoring activities. Border Patrol has argued that the restrictions are necessary to serve the government's interest in ensuring operational safety at the checkpoint. Ebanks Decl. Ex. 2. But Defendants could not point to any actual interference by Plaintiffs or the other monitors resulting from their attempts to observe and record the checkpoint. The specious nature of this claim is further evidenced by the occasions when the Border Patrol has allowed other members of the public into the alleged "enforcement" area while simultaneously excluding checkpoint monitors.

As previously explained, the Arivaca Road checkpoint is located on a rural county road where traffic is minimal. As Border Patrol has acknowledged, apprehensions at the checkpoint are extremely rare, and the checkpoint's primary role is to serve as a "deterrent." Defendants have not shown that reducing the distances for observation would create safety concerns in the instant context, and Defendants' vague and speculative safety concerns cannot support the restrictions imposed on Plaintiffs' protected speech. *Cf. Bay*

*Area Peace Navy v. United States*, 914 F.2d 1224, 1232 (9th Cir. 1990) (finding that speculative safety threats are insufficient to justify eroding constitutional freedoms).

Even assuming that the alleged "security" justification is valid, the Border Patrol's restrictions are not narrowly tailored to serve the interest in ensuring public safety while reducing the unnecessary impacts on protected rights. To the contrary, by forcing pedestrian traffic into the roadway, the barriers make the area substantially less safe. Plaintiffs have not engaged in any conduct that has created a traffic or safety hazard, and have never interfered with Border Patrol's checkpoint activities. Plaintiffs have never attempted to enter or block the street, and they have confined their activities to the public right-of-way adjacent to the street. Plaintiffs have even offered to stand on the side of the road opposite the checkpoint—where no enforcement activity takes place at all—but Border Patrol agents have still forced them to stand so far away that Plaintiffs cannot observe checkpoint interactions in any detail. The Border Patrol's arbitrary and overbroad restrictions on Plaintiffs' constitutional rights are unnecessary to serve any compelling governmental interest. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 395–96 (1992); *see also Gericke*, 753 F.3d at 8 (restricting the public's right to record police officers is impermissible if the recording does not interfere and is not about to interfere with the conduct of an officer's duties).

The restrictions have been effective in deterring monitoring. Since the time the PHP issued its preliminary report on the checkpoint, monitoring activity and participation has dropped off significantly, in large part because there is little else that can be determined from a distance. PHP has revised its data collection procedures because much basic information, including agents' identities, cannot be ascertained from so far away.

Ragan Decl. ¶¶ 33–34.  This chilling effect on Plaintiffs and PHP members more generally is a further breach of their First Amendment rights.  *See United States . v. Stevens*, 130 S.Ct. 1577, 1587-89 (2010) (finding that a court may consider the impact on the First Amendment rights of persons not before the court where others are deterred from constitutionally protected expression); *Watchtower Bible and Tract Society of New York, Inc. v. Village of Stratton*, 536 U.S. 150, 166 n.14 (2002).

### b)   Defendants' Restrictions are Unconstitutional Even if Deemed Content-Neutral

Even if the Border Patrol were able to show that its restrictions were content-neutral—which it cannot, since it created an "enforcement zone" exclusively for the Arivaca Road checkpoint, and did so solely to exclude protesters and monitors—its restrictions would be unconstitutional.  A content-neutral restriction on speech in a public forum must be (1) justified without reference to the content of the regulated speech, (2) narrowly tailored to serve a significant governmental interest, and (3) leave open ample alternative channels for communication of the information.  *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *see also ACLU of Nev.*, 333 F.3d at 1106.  As demonstrated above, no significant interest is served by these arbitrary restrctions.  They are not narrowly tailored to serve any government purpose, nor do they leave open ample alternative channels for effectively protesting, monitoring, and recording the operation of checkpoints.

In order to be narrowly tailored, a regulation must not "burden substantially more speech than is necessary to further the government's legitimate interests."  *Ward*, 491 U.S. at 799.  It "need not be the least restrictive or least intrusive means of" serving those

interests, but the government "may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Id.*  Here, the distance from which monitors are forced to observe checkpoint interactions drastically burdens their speech.  It prevents them from being able to adequately see or determine the nature of the interactions between Border Patrol agents and motorists, thereby preventing them from determining whether harassment or constitutional violations have occurred.

None of these restrictions on speech is necessary to further a legitimate interest in this case: the government "has available to it a variety of approaches that appear capable of serving its interests, without excluding individuals from areas historically open for speech and debate." *McCullen v. Coakley*, 134 S. Ct. 2518, 2539 (2014) (holding that a thirty-five foot buffer zone around an abortion clinic burdened more speech than necessary); *see also Bay Area Peace Navy*, 914 F.2d at 1229 ("75-yard security zone" was not narrowly tailored to asserted safety interests).  The current barrier is over ten car-lengths away from the checkpoint on both sides of the road.  Even on the side where vehicles are stopped for secondary inspections, Plaintiffs have never observed more than a single vehicle stopped in the secondary inspection area at any time; the traffic on Arivaca Road is extremely sparse, and the number of vehicles at the checkpoint is typically no more than one or two.  No traffic is ever diverted across Arivaca Road to the north side, and apprehensions at the checkpoint are extremely rare.

Moreover, the Border Patrol's restrictions on Plaintiffs' and the other monitors' speech does not leave open "ample alternative channels of communication." *Ward*, 491 U.S. at 802.  Forcing Plaintiffs to stand so far away from the checkpoint that they can observe little detail about the stops impermissibly burdens Plaintiffs' speech rights, and

the only remedy is to permit Plaintiffs to stand at a much closer distance.  *See Bay Area Peace Navy*, 914 F.2d at 1229–30 (citing *City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 808–10 (1984)) (noting that while all imaginable alternatives need not be provided, leaving only inadequate modes available is constitutionally unacceptable).

Accordingly, Defendants' restrictions on Plaintiffs' speech are constitutionally impermissible, whether they are content-neutral or not.

**B.    Plaintiffs Have Suffered and Continue to Endure Irreparable Harm as a Result of Defendants' Violations of their First Amendment Rights**

As a matter of law, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373–74 (1976); *see also Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("[T]he deprivation of constitutional rights unquestionably constitutes irreparable injury.")(internal quotations omitted); *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1128 (9th Cir. 2011) (harm resulting from First Amendment violations is "particularly irreparable"); *Klein v. City of San Clemente*, 584 F.3d at 1106 (9th Cir. 2009).  Thus, Defendants' act of restricting Plaintiffs from observing in a public area absent sufficient justification is itself irreparable harm.

Defendants' actions have chilled Plaintiffs and other monitors from engaging in protected activity.  Because monitors have been frustrated in their attempts to observe and record critical information, Plaintiffs' and others' monitoring activity and participation has dwindled.  Though monitoring continues on a lesser scale, PHP has revised the scope of the data sought in light of the fact that it cannot be collected from so great a distance.

Additionally, Plaintiffs have suffered and continue to suffer concrete irreparable consequences due to Defendants' restrictions, as they severely limit Plaintiffs' ability to observe interactions between Border Patrol agents and motorists.  *See* Ragan Decl. ¶ 20. Monitors are unable to determine and document the identities and specific actions of Border Patrol agents at the checkpoint, and the deterrent effect of Plaintiffs' actions is greatly reduced.  It is therefore essential for the monitors to be able to properly observe Border Patrol's interactions from a reasonable distance, as Plaintiffs are irreparably harmed by the restrictions placed on their First Amendment right to observe and record government officials.

C.    **The Balance of Equities and Public Interest Favor an Injunction to Prevent Further Constitutional Violations**

The final two elements of the preliminary injunction test—whether the public interest and the balance of the equities favor an injunction—merge when the government is a party.  *See League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014).  Plaintiffs satisfy both elements.

The balance of equities tips "sharply in favor" of an injunction when free speech rights are at stake, *Klein*, 584 F.3d at 1208, and the public interest always favors injunctions protecting freedom of speech.  *Arpaio*, 695 F.3d at 1002; *Alvarez*, 679 F.3d at 590; *Sammartano v. First Judicial District Court*, 303 F.3d 959, 974 (9th Cir. 2002); *see also Galassini v. Town of Fountain Hills, Ariz.*, No. CV-11-02097-PHX-JAT, 2011 WL 5244960, at *6 (D. Ariz. Nov. 3, 2011) (the "balancing of equities that is undertaken in a conventional equity case is out of place in dealing with rights so important as the modern

1  Supreme Court considers the rights of expression to be," quoting *Shondel v. McDermott*,

2  755 F.2d 859, 869 (7th Cir. 1985)).

3         The public also has a specific interest in preserving the right to document Border

4  Patrol activities, because the legality and efficacy of those activities is disputed and

5  because observation and documentation of those activities promotes public transparency

6  and accountability, and may help to protect the public by exposing wrongdoing.[3]  *See Glik*

7  *v. Cunnife*, 655 F.3d 78, 82–83  (1st Cir. 2011) (citing *Fordyce* in finding that the public

8  has a right to gather information about their officials, including police officers, as it aids

9

10  in the uncovering of abuses); *Robinson v. Fetterman*, 378 F. Supp. 2d 534, 541 (E.D. Pa.

11  2005) (finding that plaintiff's videotaping police officers was a legitimate means of

12  gathering information for public dissemination under the First Amendment, and provided

13  "cogent evidence" regarding plaintiff's concerns about the safety of certain police

14  activity).  The Abuse Documentation Clinic run by PHP compiled numerous accounts of

15  alleged abuse by Border Patrol agents at the Arivaca Road checkpoint, which led PHP to

16  launch the present checkpoint monitoring campaign.  To date, monitors have collected

17  some limited data to begin to corroborate these accounts that Border Patrol agents are

18

19

20

21  _____

22  [3] Others have recognized the risk inherent in widespread use of permanent immigration
    checkpoints—in particular, that they can be improperly used for broader purposes that are

23  unsupported by the narrow justification of preventing immigration law violations.
    "There's reason to suspect the agents working these checkpoints are looking for more than

24  illegal aliens. If this is true, it subverts the rationale of *Martinez–Fuerte* and turns a
    legitimate administrative search into a massive violation of the Fourth

25  Amendment…Given the strong hints that the Constitution is being routinely violated at

26  these checkpoints, we owe it to ourselves and the public we serve to look into the matter.
    Even without an order of this court or the district court, the Department of Justice would

27  be well-advised to establish the bona fides of these checkpoints." *United States v.*

28  *Soyland, 3* F.3d 1312, 1316, 1320 (9th Cir. 1993) (Kozinski, J., dissenting).

23

engaging in abusive behavior, such as racial profiling of motorists.  It is in the public interest for plaintiffs and other monitors to continue to monitor these agents' conduct in order to detect and deter further abuses.  *City of Houston, Tex. v. Hill*, 482 U.S. 451, 462–63 (1987) ("The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state.").  Monitoring the activities at checkpoints thus serves the important purpose of holding public officials accountable, and the public interest favors an injunction to stop Border Patrol from restricting the monitors' ability to adequately observe and record their conduct.

The existence of the First Amendment violations at issue also outweigh whatever burden the injunction would impose on Defendants.  The government is "in no way harmed by the issuance of an injunction that prevents the state from enforcing unconstitutional restrictions."  *Legend Night Club v. Miller*, 637 F.3d 291, 302-03 (4th Cir. 2011).  The requested injunction would not interfere with Border Patrol's ability to carry out their duties safely and effectively.  For the seven years before the monitoring campaign began, Border Patrol never prevented public access to the public right-of-way in a similar manner, and has not imposed similar restrictions at other checkpoints.  On more than one occasion since the monitoring program began, Border Patrol agents have allowed other members of the public to access this area that they have designated as their "enforcement zone."  Further, while monitoring the checkpoint, Plaintiffs and other PHP monitors  have observed that Border Patrol's inspection activities are largely confined to the primary inspection area directly surrounding the checkpoint shelter and the secondary inspection area to the east of the shelter, both on the south side of Arivaca road.  The north

24

side of the road is largely vacant and unused for inspections, as is the area west of the checkpoint.  Accordingly, allowing the monitors to observe and record checkpoint activities from the north side of the road and/or immediately outside the primary and secondary inspection areas would in no way interfere with Border Patrol's activity or compromise their safety.  *See Arpaio*, 695 F.3d at 1002 (upholding the issuance of a preliminary injunction against Arizona sheriffs where the injunction "[did] not enjoin the defendants from enforcing valid [laws], or detaining individuals [and] thus the defendants' ability to enforce local and even federal criminal law [was] not impaired by the injunction").(internal quotations omitted).

The balance of equities also tips "sharply in favor" of an injunction where, as here, a party's actions infringe "on the free speech rights not only of [the plaintiffs], but also of anyone seeking to express their views in this manner."  *Klein*, 584 F.3d at 1208.  An injunction would not only end Border Patrol's policy with respect to Plaintiffs, but also with respect to other members of PHP.  It would also put the government on notice that such actions against others at other similarly-situated immigration checkpoints are unconstitutional.  Without an injunction, others observing and recording immigration checkpoints will face enforcement of a practice and policy that violates their First Amendment rights.  Plaintiffs and others would be restricted from taking photographs or making recordings that document potential abuses and keep government agents accountable.  The balance of equities therefore weighs heavily in Plaintiffs' favor.

IV.    **CONCLUSION**

For the foregoing reasons, the Court should enter a preliminary injunction.

1       DATED this 23rd day of December, 2014.

2
3                                ACLU FOUNDATION OF ARIZONA
                               By /s/ James Lyall
4                                Daniel J.  Pochoda
                               James Lyall
5                                Victoria Lopez
                               Joel Edman
6                                3707 North 7th Street, Suite 235
                               Phoenix, AZ 85014
7

8                                ACLU FOUNDATION OF SAN DIEGO &
                               IMPERIAL COUNTIES
9                                /s/ Mitra Ebadolahi
                               David Loy
10                                Mitra Ebadolahi
                               P.O. Box 87131
11                                San Diego, CA 92138-7131
12

13                                COVINGTON & BURLING, LLP
                               /s/ Winslow Taub
14                                Winslow Taub
                               Tracy Ebanks
15                                Ethan Forrest
                               1 Front Street, 35th Floor
16                                San Francisco, CA 94612
17

18                                COVINGTON & BURLING, LLP
                               Christina E. Dashe
19                                9191 Towne Centre Drive, 6th Floor
                               San Diego, CA 92122
20

21                                *Attorneys for Plaintiffs*

22

23

24

25

26

27

28

1

**CERTIFICATE OF SERVICE**

2

    I hereby certify that on the 23rd day of December 2014, I electronically transmitted

3

4

the attached document to the Clerk's Office using the CM/ECF System for filing. Notice

5

of this filing will be sent by e-mail to all parties by operation of the Court's electronic

6

filing system or by mail as indicated on the Notice of Electronic Filing.  I further certify

7

that the attached document was served on the following counsel for Defendants, by means

8

9

of electronic mail:

10

    Eric B. Beckenhauer
    Trial Attorney

11

    U.S. Department of Justice
    Civil Division, Federal Programs Branch

12

    20 Massachusetts Ave. NW

13

    Washington, DC 20530
    Eric.Beckenhauer@usdoj.gov

14

15

Dated:        December 23, 2014

16

              Phoenix, Arizona

17

                                    /s/ Gloria Torres
                                      Paralegal

18

19

20

21

22

23

24

25

26

27

28

27