**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Leesa Jacobson and Peter Ragan, | No. CV-14-02485-TUC-BGM |
| Plaintiffs, | |
| v. | **ORDER** |
| United States Department of Homeland Security; United States Customs and Border Protection; United States Office of Border Patrol, *et al.*, | |
| Defendants. | |

Currently pending before the Court is Plaintiffs' Motion for Preliminary Injunction (Doc. 29). The Government has filed its Response (Doc. 38), and Plaintiffs have replied (Doc. 43). Oral argument was heard on April 21, 2015. Minute Entry 4/21/2015 (Doc. 46).

**I.    FACTUAL BACKGROUND[1]**

Plaintiffs are residents of Arivaca, Arizona and members of People Helping People ("PHP"), a community organization who initiated a "checkpoint monitoring campaign" to protest the United States Border Patrol checkpoint on Arivaca Road in

---

[1] For purposes of this motion, the facts have been derived from the Complaint (Doc. 1), with reference to declarations of individuals, as appropriate.

Amado, Arizona. Compl. (Doc. 1) ¶¶ 2, 9, 10; Raglan Decl. 12/23/2014 (Doc. 27-2) ¶ 3. Arivaca Road is a two-lane county road, and the checkpoint is located approximately twenty-two (22) miles east of Arivaca and one mile west of Amado, where the road meets Interstate 19. San Martin Decl. 1/30/2015 (Doc. 34-4) ¶ 6. The Arivaca Road checkpoint has been in operation for approximately seven years. Compl. (Doc. 1) ¶ 31. Generally, eastbound vehicles are individually screened, with the agent manning the primary inspection area standing on the center stripe. San Martin Decl. 1/30/2015 (Doc. 34-4) ¶ 9.

In approximately July 2013, PHP launched a campaign to protest the Arivaca Road checkpoint. Compl. (Doc. 1) ¶ 32. PHP is an all-volunteer organization, founded by residents of Arivaca, Arizona to provide humanitarian aid along the United States–Mexico border. *Id.* at ¶ 33. Beginning in approximately October 2013, PHP drafted and circulated a petition calling on Border Patrol to remove the Arivaca Road checkpoint, citing civil rights violations by agents at the checkpoint, along with harm to property values, tourism, and quality of life resulting from checkpoint operations. *Id.* at ¶ 34; Raglan Decl. 7/23/2014 (Doc. 27-2) ¶ 12. The petition also stated residents' objection to the checkpoint for its alleged role in contributing to migrant deaths and the militarization of the border region. Compl. (Doc. 1) ¶ 34.

On December 8, 2013, PHP held a rally at the Arivaca checkpoint. San Martin Decl. 1/30/2015 (Doc. 34-4) ¶ 12. The checkpoint was closed by Border Patrol for the duration of the rally for the safety of protesters, agents, and motorists. San Martin Decl. 1/30/2015 (Doc. 34-4) ¶ 12; Spencer Decl. 1/30/2015 (Doc. 34-7) ¶ 3. While checkpoint operations were suspended, traffic was permitted to pass uninspected. San Martin Decl. 1/30/2015 (Doc. 34-4) ¶ 12; Spencer Decl. 1/30/2015 (Doc. 34-7) ¶ 3.

On February 26, 2014, PHP members initiated checkpoint "monitoring" activities at the Arivaca Road checkpoint. Compl. (Doc. 1) ¶ 42; Raglan Decl. 12/23/2014 (Doc. 27-2) ¶¶ 4, 13. Monitors wore fluorescent yellow traffic vests marked "Checkpoint Monitor" and carried a sign reading "monitoring to Deter Abuse and Collect Data," as

1 well as video cameras, notepads, and PHP materials.  Compl. (Doc. 1) ¶ 43.  PHP
2 monitors sought to observe all interactions between agents and motorists during the
3 period monitoring occurred and to record relevant information based on those
4 observations.  *Id.*  The monitors were accompanied by roughly two dozen additional
5 protesters and PHP members, several of whom carried signs and banners protesting the
6 checkpoint.  *Id.* at ¶ 44.

7 PHP members were moved initially by Border Patrol agents to an area
8 approximately 200 feet east of the checkpoint.  Compl. (Doc. 1) ¶ 46.  Border Patrol
9 asserts that this boundary was approximately 150 feet east of the primary inspection area.
10 San Martin Decl. 1/30/2015 (Doc. 34-4) ¶ 13.  Border Patrol also informed the protesters
11 that they had a permit for their use of the area.  Compl. (Doc. 1) at ¶¶ 47–48.  Pima Count
12 Sherriff's Deputies eventually moved the monitors to an area directly across from where
13 the monitors were standing, at the end of a line of Border Patrol vehicles.  *Id.* at ¶ 49.
14 The monitors complain that their view was obstructed by several Border Patrol vehicles
15 that were parked along the north side of the road.  *Id.* at ¶ 50.  Border Patrol agents
16 ultimately cordoned off an "enforcement zone" to prevent pedestrian access to the
17 checkpoint.  *Id.* at ¶¶ 53–58.

18 On March 1, 2014, PHP members returned to "monitor" the checkpoint.  Compl.
19 (Doc. 1) ¶ 59.  The monitors stopped approximately 100 feet from the checkpoint, in
20 roughly the same location that they had agreed to use previously at the request of Deputy
21 Judd.  *Id*. at ¶ 60.  The monitors were approached by Border Patrol agents and told that
22 they needed to stand behind the boundary; the monitors refused and remained in place.
23 *Id.* at ¶ 61; Huey Decl. 1/30/2015 (Doc. 34-8) ¶ 3.  Approximately an hour later, Border
24 Patrol agents returned and told the monitors that either they moved or they would be
25 placed under arrest.  Compl. (Doc. 1) ¶ 62; Huey Decl. 1/30/2015 (Doc. 34-8) ¶ 3.
26 Accordingly, the monitors moved to approximately 150 feet from the checkpoint.  *Id.* at
27 63.  Border Patrol then parked a vehicle on the west side of the barrier, directly in front of
28 the PHP members, blocking their line of vision.  *Id.* at 64.  Also in March 2014, a drunk

1  motorist travelling westbound through the Arivaca checkpoint drove off the road and
2  crashed into license plate readers located on the northern roadside near the primary
3  inspection area. San Martin Decl. 1/30/2015 (Doc. 34-4) ¶ 10.

4        Plaintiffs also offer anecdotal evidence of individuals being allowed inside the
5  enforcement zone – in one case the person was someone who had harassed the protesters
6  previously, and who recorded their activities from within the enforcement zone. Compl.
7  (Doc. 1) ¶¶ 79–81. In response to this April 3, 2014 incident, Border Patrol Agent in
8  Charge Roger San Martin took corrective action "to reinforce the policy to permit only
9  authorized persons within the checkpoint for official purposes[,] and . . . to make clear
10 that incidents such as this were unacceptable." San Martin Decl. 1/30/2015 (Doc. 34-4)
11 ¶¶ 16–18. A second example given by Plaintiffs, is of a plain clothed individual arriving
12 in his truck and conversing with agents. Compl. (Doc. 1) ¶ 82. Agent in Charge San
13 Martin stated that the Complaint does not contain sufficient information to determine
14 whether this incident violates policy, because Border Patrol agents, and other law
15 enforcement agents, including those from the Drug Enforcement Agency ("DEA") and
16 Immigration and Customs Enforcement ("ICE"), work in plainclothes and often stop at
17 checkpoints for the purpose of intelligence sharing or to advise Border Patrol that they
18 are operating in the area. San Martin Decl. 1/30/2015 (Doc. 34-4) ¶ 19.

19       Plaintiffs' Complaint (Doc. 1) alleges one count of "Unlawful Regulation of
20 Plaintiffs' First Amendment Rights in a Public Forum" and one count of "Retaliation
21 Based on Rights Protected Under the First Amendment of the United States
22 Constitution." Compl. (Doc. 1) at ¶¶ 106–113. Plaintiffs claim that the "enforcement
23 zone" and regulation of Plaintiffs proximity to the checkpoint are "both broader than
24 needed to further Defendants' objectives." *Id.* at ¶ 108. Plaintiffs seek injunctive and
25 declaratory relief.

26

27 **III.  ANALYSIS**

28       Currently pending before the Court is Plaintiffs' Motion for Preliminary Injunction

and Memorandum of Points and Authorities in Support Attached (Doc. 29). Defendant has responded (Doc. 38), and Plaintiff replied (Doc. 43). Plaintiffs seek a preliminary injunction prohibiting (1) "Defendants from barring Plaintiffs from any portion of the public right-of-way more than twenty feet outside of the primary and secondary inspection areas of the Border Patrol checkpoint on Arivaca Road, including the public right-of-way on the side of the road opposite the checkpoint shelter; and (2) "Defendants from deliberately infringing or interfering with Plaintiffs' First Amendment rights to observe or record the operation of the Border Patrol checkpoint on Arivaca Road from the adjacent public right-of-way, including by deliberately parking cars between the observers and checkpoint operations and by running Border Patrol vehicle so that the exhaust reaches Plaintiffs, and by verbally harassing Plaintiffs and gratuitously threatening arrest." Pl.'s Mot. for Prelim. Inj. (Doc. 29) at 1.

### *A. Standing*

As an initial matter, the Government asserts that Plaintiffs do not have standing to bring this lawsuit. Govt.'s Response (Doc. 34) at 34. Relying on *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564, 112 S.Ct. 2130, 2138, 119 L.Ed.2d 351 (1992), the Government argues that Plaintiffs failure to demonstrate an intent to return to the Arivaca checkpoint means that they cannot establish a "'real and immediate threat' of future injury necessary to obtain prospective injunctive relief, and therefore lack standing to seek it." Govt.'s Response (Doc. 34) at 34.

Plaintiffs assert that the Government's actions, such as roping off the area around the checkpoint and parking vehicles in the monitors' line of sight, have had a chilling impact on the exercise of their First Amendment rights, and therefore represent a continuing and irreparable harm. Pls.' Reply (Doc. 40) at 16.

"Federal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377, 114 S.Ct. 1673, 1675, 128 L.Ed.2d 391 (1994). "The jurisdiction of federal courts is defined and limited by Article III of the Constitution." *Flast v. Cohen*, 392 U.S. 83, 94, 88 S.Ct. 1942, 1949, 20 L.Ed. 947 (1968). Further, the

judicial power of this and all federal courts is limited to actual cases or controversies. U.S. Const. art. III; *See also, Flast v. Cohen*, 392 U.S. 83, 94–95, 88 S.Ct. 1942, 1949–50, 20 L.Ed.2d 947 (1968).  The Supreme Court of the United States recognizes several doctrines which define the constitutional and prudential limitations on the federal courts' power to hear cases.  *Allen v. Wright*, 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984).  Included among these are the concepts of standing, mootness, ripeness and political questions.  *Id.*  Prior to invoking the power of the federal court, it must be determined "whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues."  *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975).  "[T]he standing question is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf."  *Id.*, 95 S.Ct. at 2205 (citations omitted).  "The Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party[.]" *Id.*; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 n.1, 112 S.Ct. 2130, 2136 n.1, 119 L.Ed.2d 351 (1992) ("the injury must affect the plaintiff in a personal and individual way.").

Plaintiffs bear the burden of showing that they have standing for each type of relief sought.  *Summers v. Earth Island Institute*, 555 U.S. 488, 493, 129 S.Ct. 1142, 1149, 173 L.Ed.2d 1 (2009) (citations omitted); *Lujan*, 504 U.S. at 561, 112 S.Ct. at 2136.  In order to meet this burden, Plaintiffs must show that (1) they have suffered an "injury in fact" that is (a) "concrete and particularized" and (b) "actual or imminent"; (2) a causal connection between the injury fairly traceable to defendant's actions; and (3) it is likely, not merely speculative, that the injury will be redressed by a favorable decision.  *Lujan*, 504 U.S. at 560–61, 112 S.Ct. at 2136.  "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice[;] . . . [however,] [i]n response to a summary judgment motion . . . the plaintiff can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' . . .

'supported adequately by the evidence adduced at trial.'" *Id.* at 561, 112 S.Ct. at 2137 (citations omitted).

The Ninth Circuit Court of Appeals has observed that "at the pleading stage, we have *never* required a litigant, *per impossibile*, to demonstrate a *total* chilling of his First Amendment rights to file grievances and to pursue civil rights litigation in order to perfect a retaliation claim. Speech can be chilled even when not completely silenced." *Rhodes v. Robinson*, 408 F.3d 559, 568 (9th Cir. 2004) (emphasis in original) (prisoner filed suit against prison officials alleging unconstitutional interference in his First Amendment rights to file prison grievances and seek access to the legal process). "[T]he proper First Amendment inquiry asks 'whether an official's acts would chill *or* silence a person of ordinary firmness from future First Amendment activities.'" *Rhodes*, 408 F.3d at 568–69 (quoting *Mendocino Environmental Center v. Mendocino County*, 192 F.3d 1283, 1300 (9th Cir. 1999)) (emphasis in original). Furthermore, "[i]t is well established that in the area of freedom of expression an overbroad regulation may be subject to facial review and invalidation, even though its application in the case under consideration may be constitutionally unobjectionable." *Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123, 129, 112 S.Ct. 2395, 2400–01, 120 L.Ed.2d 101 (1992) (citations omitted). "This exception from general standing rules is based on an appreciation that the very existence of some broadly written laws has the potential to chill the expressive activity of others not before the court." *Id.* at 2401 (citations omitted).

Based upon the face of the Complaint (Doc. 1) and Plaintiffs' Motion for Preliminary Injunction (Doc. 29) and Reply (Doc. 40), the Court finds Plaintiffs have alleged sufficient facts to demonstrate a concrete injury, and ongoing alleged chilling of speech. As such, Plaintiffs have standing to object to the Government's policies.

### *B. Preliminary Injunction*

During oral argument, Plaintiffs clarified that for purposes of the preliminary injunction, the alleged abridgement of their right to monitor is the only issue before the Court.

- 7 -

### 1. Standard of Review

A preliminary injunction is an extraordinary and drastic remedy and will not be granted absent a clear showing of likely success in the underlying claim and likely irreparable injury. *See Munaf v. Geren*, 553 U.S. 674, 689–90, 128 S.Ct. 2207, 2219, 171 L.Ed.2d 1 (2008); *Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S.Ct. 1865, 1867, 138 L.Ed.2d 162 (1997) (*per curiam*); *Warsoldier v. Woodford*, 418 F.3d 989, 993–94 (9th Cir. 2005); *Regents of University of California v. ABC, Inc.*, 747 F.2d 511, 515 (9th Cir. 1984); Fed. R. Civ. P. 65. To obtain a preliminary injunction, the moving party must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365, 374, 172 L.Ed.2d 249 (2008). The moving party has the burden of proof on each element of the test. *Environmental Council of Sacramento v. Slater*, 184 F.Supp.2d 1016, 1027 (E.D. Cal. 2000). Moreover, in the First Amendment arena, courts "face an inherent tension: the moving party bears the burden of showing likely success on the merits—a high burden if the injunction changes the status quo before trial—and yet within that merits determination the government bears the burden of justifying its speech-restrictive law." *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1115 (9th Cir. 2011).

Additionally, the function of a preliminary injunction is to preserve the status quo pending a determination on the merits. *Chalk v. U.S. Dist. Court*, 840 F.2d 701, 704 (9th Cir. 1988). As such, there is heightened scrutiny where the movant seeks to alter rather than maintain the status quo. *Dahl v. HEM Pharms. Corp.*, 7 F.3d 1399, 1403 (9th Cir. 1993) (holding that mandatory, as opposed to prohibitory, injunctions are "subject to a heightened scrutiny and should not be issued unless the facts and law clearly favor the moving party."). The Ninth Circuit Court of Appeals has held that this type of mandatory injunctive relief is disfavored, and should be denied unless the facts and law clearly favor the movant. *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir. 1979). There is

also heightened scrutiny where the injunction would provide substantially all the relief the movant may recover after a full trial on the merits. *Kikumura v. Hurley*, 242 F.3d 950, 955 (9th Cir. 2001).

### 2. Likelihood of Success on the Merits

The Ninth Circuit Court of Appeals has recognized that evaluation of the likelihood of success on the merits requires consideration of (1) the classification of the property under the Supreme Court of the United States' forum analysis; (2) assess the appropriate level of scrutiny for that forum; and (3) determine whether the Government's policy withstands this scrutiny. *Brown v. California Dept. of Transp.*, 321 F.3d 1217, 1221 (9th Cir. 2003).

#### a. First Amendment—In General

In its First Amendment jurisprudence, the Supreme Court of the United States has recognized "three types of fora: the traditional public forum, the public forum created by government designation, and the nonpublic forum." *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473 U.S. 788, 802, 105 S.Ct. 3439, 3449, 87 L.Ed.2d 567 (1985). "Traditional public fora are those places which 'by long tradition or by government fiat have been devoted to assembly and debate.'" Id. (quoting *Perry Education Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 45, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983)). "Public streets and parks fall into this category." *Cornelius*, 473 U.S. at 802, 105 S.Ct. at 3449. "The government can exclude a speaker from a traditional public forum 'only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest.'" *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998) (*quoting Cornelius*, 473 U.S. at 800, 105 S.Ct. 3439)). This "strict scrutiny" analysis applies to content based regulations on speech. *See Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 791, 114 S.Ct. 2516, 2537, 129 L.Ed.2d 593 (1994) (Scalia, J. concurring). "[E]ven in a public forum[,] [however,] the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions 'are justified without

reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.'" *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109, S.Ct. 2746, 105 L.Ed.2d 661 (1989) (quoting *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984)); *see also United States v. Griefen*, 200 F.3d 1256, 1260 (9th Cir. 2000). Such time, manner, place regulations represent an intermediate level of scrutiny. *See Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 642, 114 S.Ct. 2445, 2459, 129 L.Ed.2d 497 (1994).

Designated public fora "may be created by government designation of a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." *Cornelius*, 473 U.S. at 802, 105 S.Ct. at 3449. "The government does not create a [designated] public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." *Id.* "If the government excludes a speaker who falls within the class to which a designated public forum is made generally available, its action is subject to strict scrutiny." *Arkansas Educ. Television Comm'n*, 523 U.S. at 677, 118 S.Ct. at 1641 (citations omitted).

The First Amendment, however "does not guarantee access to property simply because it is owned or controlled by the government." *Cornelius*, 473 U.S. at 803, 105 S.Ct. at 3449 (*quoting United States Postal Service v. Council of Greenburgh Civic Assns.*, 453 U.S. 114, 129, 101 S.Ct. 2676, 2685, 69 L.Ed.2d 517 (1981)). "Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Cornellius*, 473 U.S. 799–800, 105 S.Ct. at 3447. The Government, "no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." *Greer v. Spock*, 424 U.S. 828, 836, 96 S.Ct. 1211, 1217, 47 L.Ed.2d 505 (1976). "Access to a nonpublic forum . . . can be restricted

as long as the restrictions are 'reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view.'" *Cornelius*, 473 U.S. at 800, 105 S.Ct. at 3448 (citations omitted) (alterations in original).

### b. Expression Versus Right of Access

Plaintiffs assert that the Arivaca Road checkpoint is a public forum, and that as such they are entitled to monitor the activities of Border Patrol agents and their interactions with the motoring public, with little limitation. *See* Pls.' Mot. for Prelim. Inj. (Doc. 29). Conversely, Defendants argue that the right of access requires only a reasonableness inquiry as to any restrictions on speech, and in any event the checkpoint is a nonpublic forum, and as such, the Government is entitled to reasonable time, manner, and place restrictions on speech. *See* Defs.' Opposition to Pls.' Mot. for Prelim. Inj. (Doc. 38) at 12–25.

Plaintiffs rely on the Ninth Circuit Court of Appeals decision in *Fordyce v. City of Seattle*, 55 F.3d 436 (9th Cir. 1995) to sustain their position. In *Fordyce*, the Ninth Circuit Court of Appeals recognized that an individual videotaping and audio-recording people on the streets of Seattle had a First Amendment right "to film matters of public interest." 55 F.3d at 439. Plaintiff Jerry Fordyce was videotaping a public protest march, ostensibly for broadcast on a public access channel. *Id.* at 438. Fordyce was filming two boys, whose adult relative asked him to stop. When Fordyce refused, the relative complained to police. *Id.* at 439. The police also asked Fordyce to stop, but he again refused. *Id.* Fordyce was arrested for violating a Washington State statute barring the recording of private conversations without the consent of all participants. *Id.* at 438. The matter was before the court of appeals regarding, *inter alia*, the district court's grant of the city defendants' motion for summary judgment as to Fordyce's 42 U.S.C. § 1983 and state tort claims. *Fordyce*, 55 F.3d at 438–39. The *Fordyce* court's recognition of a First Amendment right to film matters of public interest came in the context of overruling the district court's grant of summary judgment to an officer who allegedly pushed Fordyce's camera into his face, thereby reinstating Fordyce's First Amendment claim under 42

U.S.C. § 1983 and state law assault and battery claim against the individual officer. *Id.* at 439. The *Fordyce* court did not pass on the constitutionality of the Washington statute, nor did it make any findings regarding plaintiff's First Amendment claim beyond that there were material issues of fact necessitating trial.

The First Circuit Court of Appeals has recognized that "[t]he filming of government officials engaged in their duties in a public place, including police officers performing their responsibilities . . . serves a cardinal First Amendment interest in protecting and promoting 'the free discussion of governmental affairs.'" *Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011) (quoting *Mills v. Alabama*, 384 U.S. 214, 218, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966)). This "right to film[,] [however,] is not without limitations[—][i]t may be subject to reasonable time, place, and manner restrictions." *Glik*, 655 F.3d at 84. The plaintiff, Glik, had "filmed the defendant police officers in the Boston Common, the oldest city park in the United States and the apotheosis of a public forum." *Id.* Glik recorded an arrest from approximately ten (10) feet away, and was subsequently arrested for a violation of the Massachusetts's wiretap statute. *Id.* at 80. Glik sued for a violation of his rights pursuant to 42 U.S.C. § 1983, and the district court denied defendants' motion to dismiss on qualified immunity grounds. *Id.* The court of appeals held that although the First Amendment right to record is not unqualified, for purposes of the case before it, the district court did not err in denying qualified immunity.

Subsequently, the First Circuit Court of Appeals considered the right to film a traffic stop. *Gericke v. Begin*, 753 F.3d 1 (1st Cir. 2014). Gericke filmed an officer performing a traffic stop of a friend's vehicle. *Id*. at 3–4. The officer was aware of her presence, and never asked her to stop recording. *Id.* Gericke was arrested and charged with unlawful interception of oral communications, and brought suit against the officers under 42 U.S.C. § 1983. *Id.* at 4. The *Gericke* court reiterated a statement the court made in *Glik* acknowledging that "a traffic stop is worlds apart from an arrest on the Boston Common in the circumstances alleged [in that case.]" *Gericke*, 753 F.3d at 7 (quoting *Glik*, 655 F.3d at 85). The *Gericke* court went on to state, "[i]mportantly, an

- 12 -

individual's exercise of her First Amendment right to film police activity carried out in public, including a traffic stop, necessarily remains unfettered unless and until a reasonable restriction is imposed or in place." *Gericke*, 753 F.3d at 8. The court of appeals upheld the district court's denial of qualified immunity to the officers, but did not consider whether the wiretapping statute amounted to a reasonable time, place, and manner restriction on speech. *Id.* at 9–10.

Conversely, the Third Circuit Court of Appeals upheld a district court's grant of qualified immunity to a police officer defendant. *Kelly v. Borough of Carlisle*, 622 F.3d 248, 263 (3d Cir. 2010). Plaintiff Brian Kelly was the passenger in a friend's car, when he was pulled over for a traffic violation. *Id.* at 251. During the stop, Kelly recorded the interaction between his friend and the officer. *Id.* Kelly was arrested for violating Pennsylvania's Wiretapping and Electronic Surveillance Control Act. *Id.* Kelly brought suit under 42 U.S.C. § 1983 for a violation of his First Amendment rights. *Id.* The Third Circuit Court of Appeals found that "there was insufficient case law establishing a right to videotape police officers during a traffic stop to put a reasonably competent police officer on 'fair notice' that seizing a camera or arresting an individual for videotaping police during the stop would violate the First Amendment." *Kelly v. Borough of Carlisle*, 622 F.3d 248, 262 (3d Cir. 2010). "Moreover, even insofar as [the right] *is* clearly established, the right to record matters of public concern is not absolute; it is subject to reasonable time, place, and manner restrictions, as long as they are 'justified without reference to the content of the regulated speech, . . . are narrowly tailored to serve a significant governmental interest, and . . . leave open ample alternative channels for communication of the information.'" *Id.* (emphasis and alterations in original) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109, S.Ct. 2746, 105 L.Ed.2d 661 (1989).

The Seventh Circuit Court of Appeals, following the First Circuit, assessed the Illinois eavesdropping statute under a heightened First Amendment scrutiny. *ACLU of Illinois v. Alvarez*, 679 F.3d 583 (7th Cir. 2012). The court found that as applied, the

statute "interfere[d] with the gathering and dissemination of information about government officials performing their duties in public . . . burden[ing] speech and press rights[.]" *Id.* at 600.

Distinct from these right to record cases, the Ninth Circuit Court of Appeals has also recognized "a qualified right of access for the press and public to observe government activities." *Leigh v. Salazar*, 677 F.3d 892, 898 (9th Cir. 2012). The *Leigh* court acknowledged that "[t]he [Supreme Court of the United States] recognized 'the common understanding that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs.'" *Id.* at 898 (3d alteration in original) (quoting *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 604, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982)). In *Leigh*, the plaintiff, a photojournalist, sought unrestricted access to observe a Bureau of Land Management ("BLM") horse roundup. *Leigh*, 677 F.3d at 894. The court of appeals found that the appropriate test for plaintiff's First Amendment claim was that articulated by the Supreme Court of the United States in *Press-Enterprise Co. v. Superior Court ("Press-Enterprise II")*, 478 U.S. 1, 8–9, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986), stating:

> First, the court must determine whether a right of access attaches to the government proceeding or activity by considering 1) "whether the place and process have historically been open to the press and general public" and 2) "whether public access plays a significant positive role in the functioning of the particular process in question." 478 U.S. at 8–9, 106 S.Ct. 2735. Second, if the court determines that a qualified right applies, the government may overcome that right only by demonstrating "an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Id.* at 9, 106 S.Ct. 2735 (internal citation omitted).

*Leigh*, 677 F.3d at 898. The *Leigh* court further found that because there was no restriction on plaintiff's ability to have a dialogue with another person, "the right of access analysis [was] the more appropriate standard for [the] case." *Id.* at 898 n. 3.

For purposes of the preliminary injunction motion, the Court will assume, without deciding, that the area in question is a public forum. If the Government's restrictions

- 14 -

withstand this higher level of scrutiny, they will remain valid if the property is actually a non-public forum. Similarly, the Government's restrictions would also withstand a challenge under a right of access theory.[2]

### c. Content Neutral

Plaintiffs contend that "Defendants' actions since the erection of the barriers are inconsistent with the assertion that the roped-off area is needed for "enforcement," and evince a pattern of selective targeting of Plaintiffs." Pls.' Mot. for Prelim. Inj. and Mem. of Points and Authorities in Support (Doc. 29). Defendants assert that the policy is "to permit only authorized persons within the checkpoint for official purposes." San Martin Decl. 1/30/2015 (Doc. 38-4) ¶¶ 17–18.

"The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 2754, 105 L.Ed.2d 661 (1989) (citations omitted). "[A] facially neutral law does not become content based simply because it may disproportionately affect speech on certain topics." *McCullen v. Coakley*, — U.S. —, 134 S.Ct. 2518, 2531, 189 L.Ed.2d 502 (2014). "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward*, 491 U.S. at 791, 109 S.Ct. at 2754. "The question in such a case is whether the law is 'justified without reference to the content of the regulated speech.'" *McCullen*, — U.S. —, 134 S.Ct. at 2531 (quoting *Renton v. Playtime Theaters, Inc.*, 475 U.S. 41, 48, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986).

Here, Defendants primary interest is in protecting the safety and security of Border Patrol agents, canines, and the public. San Martin Decl. 1/30/2015 (Doc. 38-4) ¶¶ 10–11. Furthermore, "[C]heckpoint stops are 'seizures' within the meaning of the Fourth

---

[2] The Court notes that it finds that the right of access assessment of *Leigh* is not appropriate in this case. Unlike *Leigh*, there is the potential for discussion between monitor and checkpoint motorists. *See Leigh*, 677 F.3d at 898 n.3.

Amendment." *Martinez-Fuerte v. United States*, 428 U.S. 543, 556, 96 S.Ct. 3074, 3082, 49 L.Ed.2d 1116 (1976). The Supreme Court of the United States has "upheld brief, suspicionless seizures of motorists at a fixed Border Patrol checkpoint designed to intercept illegal aliens, . . . and at a sobriety checkpoint aimed at removing drunk drivers from the road[.]" *City of Indianapolis v. Edmond*, 531 U.S. 32, 37, 121 S.Ct. 447, 452, 148 L.Ed.2d 333 (2000) (internal citations omitted). Such programs were "designed to serve 'special needs, beyond the normal need for law enforcement.'" *Id.* (citations omitted). As such, checkpoint stops are criminal investigations, which if frustrated may "jeopardize the integrity of the search for truth that is so critical to the fair administration of justice." *Times Mirror Co. v. U.S.*, 873 F.2d 1210, 1213 (9th Cir. 1989) (discussing the public right of access to judicial proceedings, and the negative impact that openness may have on criminal fact-finding).

Plaintiffs argue that Defendants are targeting their speech. As an example Plaintiffs assert that when a land surveyor, who surveyed the property on and around the checkpoint, asked why there were roped off areas, Border Patrol agents explained that "the barriers were in place to exclude people who might interfere with Border Patrol activities[.]" McLain Decl 12/23/2014 (Doc. 29-3) ¶ 15. Plaintiffs assume that this demonstrates that agents are targeting them. Interference can occur when the source is deemed positive or negative. The message of the speaker is irrelevant. In this case, the policy applies equally to Plaintiffs, cartel members who wish to obtain information regarding the transport of their load, or members of the public who wish to cheer in support of the checkpoint. As such, Defendants' policy to exclude those who do not have official business within the boundaries of the checkpoint is content neutral.

### d. Significant Government Interest

"It has been a national policy for many years to limit immigration into the United States." *Martinez-Fuerte v. United States*, 428 U.S. 543, 551, 96 S.Ct. 3074, 3080, 49 L.Ed.2d 1116 (1976). As such, there is a substantial public interest "in the practice of routine stops for inquiry at permanent checkpoints." *Id.* at 556, 96 S.Ct. at 3082. It is

undisputed that the Government's interest in enforcing its laws is substantial.

### e. Narrowly Tailored

Plaintiffs assert that Defendants' policy is not narrowly tailored, because the barriers "forc[e] pedestrian traffic into the roadway," and that "Plaintiffs have even offered to stand on the side of the road opposite the checkpoint—where no enforcement activity takes place at all[.]" Pls.' Mot. for Prelim. Inj. and Mem. of Points and Authorities in Support (Doc. 29) at 24. Further, Plaintiffs assert that the policy "prevents them from being able to adequately see or determine the nature of the interactions between border Patrol agents and motorists, thereby preventing them from determining whether harassment or constitutional violations have occurred." *Id.* at 26. Conversely, Defendants reiterate the need to protect the safety of agents and the public. *See* Defs.' Response to Mot. for Prelim. Inj. (Doc. 38) at 19–20.

"[T]he requirement of narrow tailoring is satisfied 'so long as the . . . regulation promotes a substantial government interest that would be achieved less affectively absent the regulation.'" *Ward v. Rock Against Racism*, 491 U.S. 781, 799, 109 S.Ct. 2746, 2758, 105 L.Ed.2d 661 (1989) (alterations in original) (quoting *United States v. Albertini*, 472 U.S. 675, 689, 105 S.Ct. 2897, 2906, 86 L.Ed.2d 536 (1985)). Such restriction "need not be the least restrictive or least intrusive means of doing so." *Id.* at 798, 109 S.Ct. 2757–58. "[T]he government still 'may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals.'" *McCullen v. Coakley*, — U.S. —, 134 S.Ct. 2518, 2535, 189 L.Ed.2d 502 (2014) (quoting *Ward*, 491 U.S. at 799, 109 S.Ct. at 2758)).

Plaintiffs rely on *McCullen* to argue that Border Patrol "has available to it a variety of approaches that appear capable of serving its interests, without excluding individuals from areas historically open for speech and debate." *McCullen*, 134 S.Ct. at 2539. The Supreme Court in *McCullen* held that a thirty-five (35) foot buffer zone around Massachusetts abortion clinics burdened more speech than necessary, because it severely impeded petitioners' ability to distribute literature and speak to clinic patients

1 one-on-one, without shouting. *Id.* at 2536–37. Plaintiffs also cite to *Bay Area Peace Navy v. United States*, 914 F.2d 1224 (9th Cir. 1990), where a 75-yard security zone was deemed too broad in light of the "speculative threat of violent attack[.]" *Bay Area Peace Navy*, 914 F.2d at 1228. The *Bay Area Peace Navy* court, however, recognized that "a tangible threat to security" could result in modification of a narrower injunction. *Id.*

Unlike in *Bay Area Peace Navy*, however, the Government's concern for agent and public safety is not speculative. *See* San Martin Decl. 1/30/2015 (Doc. 38-4) ¶ 10–11. Furthermore, there are standard weapon-retention techniques that preclude allowing Plaintiffs to occupy the area on the north side of the street. *Id.* at 20. Moreover, as this is a rural road, there are no sidewalks or other pedestrian only areas for Plaintiffs to stand. The shoulder of a road does not provide any buffer between Plaintiffs and vehicle traffic. The enforcement zone also allows Border Patrol to park its vehicles in a manner serving a legitimate law enforcement purpose, as well as maintaining a safety zone for the protection of all involved. *See United States v. Griefen*, 200 F.3d 1256, 1262 (150 foot closure order surrounding construction area in a national park valid time, place, and manner restriction on speech). Additionally, the 180-foot enforcement zone runs east and west from the center of the checkpoint, the secondary inspection area extends approximately 100-feet from the center of the checkpoint. Defs.' Response to Mot. for Prelim. Inj. (Doc. 38) at 20.

Further, the sample "Checkpoint Vehicle Stop Report[s]" Plaintiffs have submitted do not reflect Plaintiffs' inability to monitor the checkpoint. *See* Pls.' Reply (Doc. 43), Exh. "1." The reports include the date, day of the week, as well as arrival and departure time. *Id.* Monitors then circle whether a vehicle was a sedan; SUV; van; truck; bus; or other, and whether the vehicle was newer; older; battered; washed; unwashed; bumper stickers; or other. *Id.* Some information is recorded by circling "yes" or "no," such as Arizona license plate, interior search at secondary, canine search at secondary, or physical search of occupants. *Id.* Other information requires a fill-in or check response, such as the number of occupants and whether they were male, female, children, teens,

1 adults or over 50, whether occupants made comments to the monitors, and other incidents
2 and observations. *Id.* Monitors circle whether a search occurred at primary, with choices
3 of none; visual exterior; canine; alerted; or interior. *Id.*

4 On March 25, 2015, a monitor was able to document the ethnicity of the driver,
5 the type and characteristics of the vehicle and driver, and that the individual showed
6 papers. Pls.' Reply, Exh. "1" (Doc. 43-2) at 473. On April 15, 2015, a monitor, in
7 addition to the standard form answers, provided information regarding what occurred at
8 secondary including that the driver got out of the vehicle, a canine sniff being performed,
9 and where on the vehicle was searched. *Id.*, Exh. "1" (Doc. 43-3) at 404. Similarly, the
10 "Checkpoint Monitoring: Shift Report" which indicates summary information, including
11 law enforcement personnel, are filled out with varying degrees of completeness. *See id.*,
12 Exh. "1" (Doc.43-2) at 52, Exh. "1" (Doc. 43-3) at 465, 517. As such, the Court finds
13 that the 180-foot enforcement zone is a valid time, place, and manner restriction on
14 Plaintiffs' speech.

### 3. Remaining Factors

16 In light of the Court's determination that Defendants' policy is a valid time, place,
17 and manner restriction on speech, Plaintiffs cannot meet their burden to show a likelihood
18 of success on the merits. As such, the Court will not consider the remaining factors
19 necessary to support entry of a preliminary injunction.

20 . . .
21 . . .
22 . . .
23 . . .
24 . . .
25 . . .
26 . . .
27 . . .
28 . . .

IV. **CONCLUSION**

Based upon the foregoing, Defendants' policy restricting pedestrian access to the Arivaca Border Patrol Checkpoint is a valid time, place, and manner restriction on speech. As such, Plaintiffs have not met their burden to warrant entry of a preliminary injunction. Accordingly, IT IS HEREBY ORDERED that Plaintiffs' Motion for Preliminary Injunction (Doc. 29) is DENIED.

Dated this 14th day of September, 2015.

_____
Honorable Bruce G. Macdonald
United States Magistrate Judge